MCI TELECOMMUNICATIONS
CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

American Telephone & Telegraph Co.,
et al., Intervenors.

Nos. 86–1181, 86–1248.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 22, 1988.

Decided March 29, 1988.

Ellen G. Block, with whom John M. Scorce and Ruth S. Baker–Battist, Washington, D.C., were on brief, for petitioner. William J. Byrnes, Washington, D.C., also entered an appearance for petitioner.

John Ingle, Deputy Associate Gen. Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Linda L. Oliver and Laurel R. Bergold, Counsel, F.C.C., and Robert Nicholson and Andrea Limmer, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondents. Catherine G. O'Sullivan, Atty., U.S. Dept. of Justice, Washington, D.C., also entered an appearance for respondent U.S.

William R. Drexel, St. Louis, Mo. (for Southwestern Bell), with whom Raymond F. Scully, Alan B. Sternstein, St. Louis,

Mo., and John W. Berresford, Philadelphia, Pa. (for Bell intervenors); Jonathan S. Hoak, David W. Carpenter, Chicago, Ill., and Francine J. Berry, New York City (for American Tel. & Tel. Co.); Alfred Winchell Whittaker, Washington, D.C. (for Ameritech Operating Companies); R. Frost Branon, Jr., Atlanta, Ga. (for BellSouth Telephone Companies); Saul Fisher, Bedminster, N.J. (for NYNEX Telephone Companies); Dan T. Foley, Oklahoma City, Okl. (for Southwestern Bell Telephone Co.); and Robert B. McKenna, Washington, D.C. (for U.S. West Telephone Companies) were on the joint brief, for intervenors.

Thomas J. Reiman, Chicago, Ill., entered an appearance for intervenors Ameritech Operating Companies, et al.

Katherine I. Hall, Washington, D.C., entered an appearance for intervenors the Bell Telephone Co. of Pennsylvania, et al.

Martin J. Silverman, White Plains, N.Y., entered an appearance for intervenor NYNEX Telephone Companies.

Robert L. Barada and Stanley J. Moore, San Francisco, Cal., entered appearances for intervenor Pacific Telesis Telephone.

T. Michael Payne, St. Louis, Mo., entered an appearance for intervenor Southwestern Bell Telephone Co.

Jules M. Perlberg and Dale E. Thomas, Chicago, Ill., entered appearances for intervenor AT & T.

Lawrence W. Katz, James R. Young, Washington, D.C., and J. Manning Lee entered appearances for intervenor Bell Atlantic Telephone Companies.

H. Richard Juhnke and Peter G. Wolfe, Washington, D.C., entered appearances for intervenor Western Union Corp. in No. 86–1181.

John A. Ligon, New York City, entered an appearance for intervenor U.S. Sprint in No. 86–1181.

Randolph J. May, Timothy J. Cooney, Joseph DeFranco, Howard Monderer, and Daniel A. Huber, Washington, D.C., entered appearances for intervenors American Broadcasting Companies, et al. in No. 86–1181.

Dana A. Rasmussen and Robert B. McKenna, Washington, D.C., entered appearances for intervenor Mountain States Tel. & Tel. Co., et al.

Before MIKVA, EDWARDS, and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge EDWARDS.

Opinion filed by Circuit Judge BUCKLEY, dissenting in part.

HARRY T. EDWARDS, Circuit Judge:

In this case MCI Telecommunications Corporation ("MCI") has petitioned for review of an order by the Federal Communications Commission ("FCC") in *Investigation of Special Access Tariffs of Local Exchange Carriers,* FCC 86–52 (Jan. 24, 1986) (*"Special Access Order"*), *reprinted in* Joint Appendix ("J.A.") 771.[1] MCI alleges that the special access tariffs charged by local exchange carriers, the Bell Operating Companies ("BOCs"), are unreasonably discriminatory in light of the amounts that American Telephone and Telegraph Company ("AT & T") is required to pay to lease equipment used to perform identical functions pursuant to Shared Network Facilities Agreements ("SNFAs") with the BOCs. The FCC found to the contrary in its *Special Access Order* and MCI now challenges that ruling as arbitrary and capricious. MCI further contends that the FCC was statutorily obliged to require AT & T and the BOCs to file copies of the SNFAs and associated price information, and that it failed to do so.

---

1. For purposes of oral argument before this court, this case was consolidated with a petition by the Western Union Telegraph Company for review of portions of the FCC's *Special Access Order* and the FCC's Memorandum Opinion and Order on Reconsideration in *Investigation of* *Special Access Phase I Tariffs of Local Exchange Carriers,* 1 F.C.C.Rcd. 427 (1986). The two petitions raise completely unrelated objections, and we have decided to dispose of them in separate opinions.

Although we reject the latter contention because MCI did not clearly raise the issue of mandatory filing before the FCC, we find that MCI's first charge has merit. We therefore remand the case to the FCC for further consideration of MCI's allegation of price discrimination.

## I. BACKGROUND

Under AT & T's antitrust settlement with the Government, and following divestiture on January 1, 1984, the BOCs were required to provide all interexchange carriers, such as MCI, with access to local exchange facilities "on an unbundled, tariffed basis, that is equal in type, quality, and price to that provided to AT & T and its affiliates." *United States v. AT & T,* 552 F.Supp. 131, 227 (D.D.C.1982), *aff'd mem. sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The FCC distinguished two broad categories of services provided by the BOCs to interexchange carriers. "Switched" access involves the shared use of local exchange facilities to originate and complete long-distance calls. "Special" access involves the exclusive use of certain BOC facilities, generally private communications lines linking the end user's premises to a BOC wire center and linking the wire center to the premises of an interexchange carrier. Although special access circuits may be used to transmit ordinary voice communications, they are also used extensively to transmit telex, telegraph, video and other types of signals between end users and interexchange carriers, as well as between different offices of the same interexchange carrier. In its *Special Access Order,* the FCC approved the set of special access tariffs that MCI is now challenging.

MCI's contention is not that the tariffs themselves differ among interexchange carriers, but rather that they are unreasonably discriminatory by comparison with a separate set of charges paid by AT & T to the BOCs for the use of local exchange facilities. It is therefore essential to review one aspect of the AT & T divestiture in greater detail. Pursuant to the antitrust consent decree, assets were divided between AT & T and the BOCs according to the functions they were used to perform. Assets used to provide local exchange services and exchange access were assigned to the BOCs, whereas those used to supply interexchange services remained with AT & T. *See* 552 F.Supp. at 206. Approximately twenty percent of the existing assets, however, were used to provide both types of service. The decree required that ownership of these multifunction assets would be assigned according to the predominant use that was made of them. *Id.* at 207. It further provided that the entity that did *not* acquire a certain item of multifunction property could lease that property from the owner, in order to obviate the wasteful construction of duplicate facilities. *See id.* at 227 (Modification of Final Judgment § I(A)(2)); *see also id.* at 197 n. 278, 207 n. 316. Under the terms of the Plan of Reorganization filed by AT & T and approved by the District Court, these lease agreements, dubbed Shared Network Facilities Agreements ("SNFAs"), were to employ the same cost-based pricing system regardless of whether AT & T or a BOC was the lessor. *See* Plan of Reorganization (D.D.C., filed Dec. 16, 1982), *reprinted in* J.A. 2, 41–53.[2]

During 1983, that is, prior to the date of divestiture, AT & T negotiated close to 17,000 SNFAs with what were then its subsidiaries. Approximately half were leases from AT & T to a BOC; the remainder were leases from a BOC to AT & T. *See Special Access Order* at 22 n. 72, J.A. 792 n. 72. In seeking FCC approval of the transfer of ownership necessary to consummate divestiture, AT & T submitted in the public record a draft master SNFA in excess of 750 pages, along with a Standard Costing Manual in excess of 200 pages describing the method to be used to calcu-

---

**2.** The District Court required several modifications of the Plan that are not relevant to this suit. *See United States v. Western Elec. Co.,* 569 F.Supp. 1057 (D.D.C.), *aff'd sub nom. California v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).

late lease charges.[3] AT & T did not, however, file copies of actual lease agreements, nor did the FCC order AT & T or the BOCs to submit copies of the SNFAs. In spite of its lack of precise information concerning lease charges, the FCC approved the transfer. It further refused to require the BOCs to lease equipment covered by the SNFAs to other interexchange carriers or to eliminate any disparities between those lease charges and corresponding cost elements of the special access tariffs.[4] The FCC explained:

> [T]he record [does not] contain[ ] sufficient information to justify imposition of this condition. At this time, we have no information showing that AT & T will be obtaining discriminatory access to operating company facilities. If it becomes necessary in the future, we have sufficient authority under Section 211 of the Communications Act, 47 U.S.C. § 211, to require the submission of the shared facilities agreements and any other agreements between the carriers. In addition, under Section 201 of the Act, 47 U.S.C. § 201, we may require the [BOCs] to provide facilities to other carriers should we find such a requirement to be in the public interest.

*Consolidated Application of AT & T and Specified Bell System Companies*, 96 F.C. C.2d 18, 57–58 (1983) (footnote omitted).

In late 1983, the FCC opened an investigation into the first group of post-divestiture access tariffs filed by the BOCs. *See Investigation of Access and Divestiture Related Tariffs*, 54 Rad.Reg.2d (P & F) 1119 (1983). During this investigation, the question arose whether the services offered under tariff were "like" those available to AT & T under the SNFAs, and, if so, whether the disparity in charges was unreasonably discriminatory. In attempting to answer it, the FCC's Common Carrier Bureau requested information about existing SNFAs from three of the seven Bell Regional Holding Companies. More specifically, the FCC asked them to "highlight any substantive changes" to the draft master SNFA filed by AT & T in 1983, to "provide a sample contract for conduit you will lease to AT & T," and to "provide a contract for switching capacity you will lease from AT & T." Letter from Jack D. Smith to Roger Burge (July 18, 1984), *reprinted in* J.A. 189–90.[5] In response, the Regional Holding Companies supplied several model contracts and aggregate price data. They did not, however, provide copies of actual contracts or reveal the actual lease charges paid by AT & T.[6]

In an Order released on February 19, 1985, the FCC provisionally rejected MCI's charge that the SNFAs rendered the special access tariffs unreasonably discriminatory. The FCC stated, however, that should further investigation indicate that MCI's claim had merit, the special access tariffs might require modification. *See Investigation of Access and Divestiture Related Tariffs*, 50 Fed.Reg. 12,637, 12,647 (Mar. 29, 1985).

Shortly thereafter, the FCC initiated an investigation of this issue. Two questions it set out to answer were whether "the facilities provided under SNFAs constitute

---

**3.** Excerpts from both documents are reprinted in J.A. 64–186. FCC approval was required under 47 U.S.C. § 214 (1982).

**4.** No direct comparison between SNFA lease charges and special access tariffs is possible, because special access tariffs are charges for the provision of a certain type of service, whereas SNFAs cover only some of the equipment used to provide that service. The costs underlying special access tariffs include labor, maintenance, and other costs for which the SNFAs make no provision.

**5.** The BOCs were also asked to summarize the number of contracts and the annual aggregate value of the leases for conduits, switches and

other facilities, as well as to describe and explain their conduit sharing policies.

**6.** The information supplied by the BOCs is described in three cover letters they sent. *See* Letter of James J. Farrell (Bell Atlantic) to Jack D. Smith (Aug. 17, 1984), *reprinted in* J.A. 191–92; Letter from James K. Smith (Ameritech) to Jack D. Smith (Aug. 17, 1984), *reprinted in* J.A. 193–94; Letter from Roger Burge (Bell South) to Jack D. Smith (Aug. 17, 1984), *reprinted in* J.A. 195–97. Although the BOCs had requested that this information be kept confidential, MCI obtained copies of the papers by filing a Freedom of Information Act request. *See* Brief for FCC at 11.

special access service," and whether "the special access tariffs unlawfully discriminate against interexchange carriers that cannot obtain SNFAs." *Investigation of Special Access Tariffs of Local Exchange Carriers,* 50 Fed.Reg. 23,189, 23,191 (1985). The investigation was conducted as a notice-and-comment proceeding, with the BOCs filing "Direct Cases," followed by the "Oppositions" and "Comments" of MCI and other interexchange carriers and the BOCs' final "Rebuttals."[7] The FCC ruled on this issue in its *Special Access Order,* released on January 24, 1986, without requiring or receiving copies of actual SNFAs or lists of the prices charged to AT & T pursuant to them. MCI alleges that the FCC's determination that the special access tariffs were not unreasonably discriminatory in light of the SNFAs was arbitrary and capricious, because the FCC neglected to obtain information essential to support its finding and because it failed adequately to explain its conclusion. MCI further contends that the FCC disregarded an independent statutory obligation to require AT & T or the BOCs to submit copies of the actual SNFAs and collateral information about lease charges paid by AT & T.

## II. ANALYSIS

### A. *Standard of Review*

Under the Administrative Procedure Act, made applicable to review of final orders of the FCC by 47 U.S.C. § 402(g) (1982), a court must set aside agency actions, findings and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). The Supreme Court has described the appropriate standard of review as follows:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* [419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)]; *Citizens to Preserve Overton Park v. Volpe,* [401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947). We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transporation, Inc. v. Arkansas–Best Freight System, Inc., supra,* [419 U.S.] at 286 [95 S.Ct. at 442]. See also *Camp v. Pitts,* 411 U.S. 138, 142–143 [93 S.Ct. 1241, 1244, 36 L.Ed.2d 106] (1973) (*per curiam*).

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

It bears emphasis that in determining whether a "rational connection" exists between the FCC's factual findings and its conclusion, "we must be able to discern this connection in the record and the agency decision. *Post hoc* rationalizations advanced to remedy inadequacies in the agen-

---

7. Relevant portions of these submissions are collected at J.A. 264–747.

cy's record or its explanation are bootless." *City of Brookings Mun. Tel. Co. v. FCC,* 822 F.2d 1153, 1165 (D.C.Cir.1987) (citations omitted).

**B.** *The FCC's Failure to Require Filing of the SNFAs Pursuant to Section 211(d)*

In the course of its investigation, the FCC never requested AT & T or the BOCs to submit copies of some or all of the SNFAs and evidence of the actual lease charges AT & T paid thereunder, although the FCC did have on file a draft master SNFA from 1983 and an accounting manual setting forth the methods to be used to calculate lease charges. MCI claims that section 211(a) of the Communications Act required the FCC to obtain copies of the SNFAs, and that case law and FCC precedent likewise mandated that course.

Section 211 of the Communications Act provides:

(a) Every carrier subject to this Act shall file with the Commission copies of all contracts, agreements, or arrangements with other carriers ... in relation to any traffic affected by the provisions of this Act to which it may be a party.

(b) The Commission shall have authority to require the filing of any other contracts of any carrier, and shall also have authority to exempt any carrier from submitting copies of such minor contracts as the Commission may determine.

47 U.S.C. § 211 (1982).

MCI argues that section 211(a) clearly applies to the SNFAs, because AT & T and the BOCs are both "carriers" within the meaning of the statute, because the SNFAs are undoubtedly "agreements," and because they concern "traffic affected by the provisions of the Act." In addition, MCI asserts that the FCC has consistently required the filing of intercarrier agreements. Finally, MCI cites *Bell Telephone Co. v. FCC,* 503 F.2d 1250, 1276–79 (3d Cir.1974), *cert. denied,* 422 U.S. 1026, 95

S.Ct. 2620, 45 L.Ed.2d 684 (1975), for the proposition that facility lease agreements of "precisely the same kind[ ] ... that are at issue here" must be filed pursuant to section 211(a). Brief of Petitioner MCI at 20.

It is by no means apparent, however, that MCI's contention is correct. The FCC argues in its brief that section 211(a) "is designed to enable the Commission to review privately negotiated intercarrier agreements." Brief for FCC at 36. In the FCC's view, section 211(a)'s filing requirement does not encompass court-approved asset-sharing agreements necessitated by an antitrust settlement, which are not "agreements ... with other carriers" as the phrase is naturally understood. *Id.* at 36–37. Although this question is not free from doubt, the FCC's reading of the statute is entitled to deference, and MCI has not adduced evidence from the legislative history of section 211 suggesting that the FCC's construction is erroneous.

The FCC's position, moreover, is consistent with FCC precedent cited by MCI, as well as with the Third Circuit's decision in *Bell Telephone Co.* In *Bell System Tariff Offerings of Local Distribution Facilities for Use by Other Common Carriers,* 46 F.C.C.2d 413, 430–31 (1974), which the Third Circuit affirmed in *Bell Telephone Co.,* the FCC indeed said that intercarrier leases of local facilities had been properly filed under section 211(a). That case, however, involved the permissibility of a privately negotiated lease agreement between two competitors, AT & T and Western Union, in lieu of tariffs, and copies of the leases had in any event been filed without protest by the parties. Similarly, in *Exchange Network Facilities for Interstate Access,* 71 F.C.C.2d 440, 447 n. 12 (1979), and *Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor,* 84 F.C.C.2d 445, 482 (1982), only privately negotiated contracts were at issue.[8] The FCC's failure to require AT & T or the

---

8. None of these earlier cases involved court-approved asset-sharing arrangements as with the AT & T antitrust settlement. Because the antitrust litigation covered matters beyond the compass of the FCC's jurisdiction under the Communications Act, it is not surprising that the agency has treated SNFAs differently than privately negotiated intercarrier agreements.

BOCs to file copies of the SNFAs is thus not inconsistent with its earlier decisions.[9]

■ In order to dispose of MCI's claim under section 211(a), however, we need not resolve this dispute. As the FCC notes, MCI is barred from raising this challenge in court because it never presented its argument to the FCC before seeking judicial review. Section 405 of the Communications Act provides in part:

> The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any [FCC] order, decision, report, or action, except where the party seeking such review ... relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass.

47 U.S.C. § 405.

As MCI concedes, section 405 "bars review where an issue was simply not raised before the agency." Reply Brief of Petitioner MCI at 3. In a similar case involving an issue raised for the first time on appeal, we refused to address the merits of the petitioner's argument, saying:

> We decline to decide this issue, for even if Gencom is correct in its contention that the FCC misread the initial decision, Gencom *never raised* this issue before the Commission. Gencom's omission deprives us of both an adequate record and the benefit of the FCC's expertise in resolving this issue.
>
> . . . .
>
> ... Since Gencom twice eschewed opportunities to raise its objections before the Commission, we hold that it is precluded from doing so for the first time before this court.

*Gencom Inc. v. FCC,* 832 F.2d 171, 187 (D.C.Cir.1987) (emphasis in original); *see also Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 681–83 (D.C.Cir.1983).

For the same reason, we offer no final judgment on MCI's contentions with respect to section 211. Although MCI did say, in its Opposition to the Direct Cases submitted by the BOCs, that "[t]he Commission's current failure to demand that AT & T and the BOCs file the SNFA service agreements with the necessary cost support is contrary to the public interest," MCI Opposition to Direct Cases at 7, *reprinted in* J.A. 449, this statement does not refer to section 211, let alone suggest that filing of the SNFAs is mandatory under section 211(a) rather than discretionary under section 211(b). Likewise, in its conclusion, "MCI respectfully propose[d] that the Commission require that AT & T buy all of its BOC-provided dedicated transmission and switching under tariff, or under contracts filed with the FCC pursuant to 47 U.S.C. Section 211." MCI Opposition to Direct Cases at 41, J.A. 482. This proposal, however, appears to have been a recommendation that AT & T be required to buy at least some of the equipment leased under the SNFAs, rather than a suggestion that the FCC order the filing of existing SNFAs. Even if appearances are misleading, MCI's request failed to distinguish, once again, between section 211(a) and section 211(b), and thus supplied the FCC with no reason to address the question whether SNFAs had to be filed pursuant to section 211(a). Because MCI neglected to articulate with sufficient specificity in its submissions to the FCC the concerns it voices before this court about the applicability of section 211(a), MCI's challenge under section 211(a) will not be heard on review.

C. *The FCC's Finding that the Special Access Tariffs Are Not Unreasonably Discriminatory*

Section 202(a) of the Communications Act, 47 U.S.C. § 202(a), reads in full:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or

---

**9.** The FCC also argues that it was authorized under section 211(b) to exempt the SNFAs from any applicable filing requirements because they qualify as "minor contracts" for purposes of that section. The sums paid under the vast majority of individual SNFAs are small, the FCC asserts, and the SNFAs have but a brief lifespan. *See* Brief for FCC at 37. In light of our holding, it is unnecessary for us to address this point.

services for or in connection with like communications service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

In its *Special Access Order*, the FCC concluded that the BOCs' special access tariffs were not unreasonably discriminatory in light of the lease charges paid by AT & T under the SNFAs, even though the FCC had not examined any SNFAs or compared the amounts paid by AT & T with the amounts charged to other interexchange carriers for corresponding cost elements under the special access tariffs. *Special Access Order* at 22–32, J.A. 792–802. MCI urges this court to find the FCC's conclusion arbitrary and capricious. MCI contends that the only way to determine whether there exist unjust or unreasonably discriminatory charges for like facilities or services, in violation of section 202(a), is to scrutinize the facilities leased under the SNFAs with the special access services sold under tariff to determine whether they are alike; then, if they are alike, to review the charges under the SNFAs and the special access tariffs to see whether any of those charges are discriminatory; and, finally, if some charges are discriminatory, to decide whether that discrimination is unjust or unreasonable. MCI advanced this argument repeatedly in proceedings before the FCC. The agency, by its own admission, did not undertake this analysis.

We find that some legitimate version of this three-stage inquiry is essential to ascertain whether unreasonable discrimination exists. For reasons that follow, we also reject as inadequate the FCC's explanation for its conclusion that the special access tariffs are not unreasonably discriminatory when set beside the SNFA charges. We therefore remand this case to the FCC for further consideration of MCI's allegation of price discrimination.

### 1. The FCC's Reasoning Below

In its *Special Access Order*, the FCC begins by stating that it need not decide the question whether certain facilities leased under the SNFAs are "like" various facilities whose costs enter into the calculation of special access tariffs. *Special Access Order* ¶ 54, J.A. 798. By implication, it also need not consider whether, if such facilities were "functionally equivalent," the corresponding charges were discriminatory. In the FCC's view, it suffices, for purposes of section 202(a), that whatever charges exist are reasonable, however unequal they might be. And the FCC can make the latter determination, it believes, simply by reviewing the history, nature, and future of the two sets of charges. The size of the gap between prices under the two schemes is, in the FCC's judgment, irrelevant to their permissibility under section 202(a).

■ Before considering in detail the FCC's proffered justification of its conclusions, we pause to emphasize the irrationality of the FCC's approach. Section 202(a) expressly proscribes "any unjust or unreasonable discrimination in charges." In determining whether one charge is unjust or unreasonable by comparison with another, it is by no means sufficient merely to inspect the ways in which those charges arose and the methods by which they were computed. Attention must also be given to the absolute and relative disparity between them. However unimpeachable the origins of the SNFAs and the special access charges, and however reasonable they may appear when viewed in isolation from one another, they cannot be sustained under section 202(a) unless the resulting differences between them, to the extent that they are based on the costs of like facilities, are not unjust or unreasonable in amount. In reaching its conclusion without looking to see how charges are actually calculated under the SNFAs, that is, how the costing methodologies submitted to the FCC are in fact applied, and without examining the nominal and relative differences between the amounts that AT & T and other interexchange carriers must pay for functionally equivalent facilities and the ec-

onomic impact that any differences are likely to have, the FCC betrayed its statutory mandate. Its willful blindness in this regard fully deserves the label "arbitrary and capricious."

### (a) Different Pricing Methodologies

The first of four justifications that may be extracted from the FCC's opaque discussion rests on the allegedly different ways in which the two sets of charges are devised. According to the FCC, "[d]ifferences between actual SNFA charges and particular special access rates appear to be reasonably related to the fact that these charges and rates are developed according to entirely different methodologies." *Special Access Order* at ¶ 58, J.A. 801. "It would be unreasonable," the FCC declares, "to require that charges covering different offerings and developed according to different methodologies be made equal." *Id.* at ¶ 58 n. 97, J.A. 801.

Setting aside the fact that the FCC neglects to say precisely how those methodologies differ and why those differences should cause charges to diverge in this case, the problem with the FCC's argument is that it leaves open the fundamental question why the use of "entirely different methodologies" should be permitted under section 202(a) if they lead to radically unequal charges for like services or facilities.[10] The FCC is required by statute to approve special access tariffs only so long as they conform to the dictates of section 202(a). If certain tariffs are discriminato-

ry, it is not enough to point to the fact that they were computed in accordance with dissimilar methodologies. The FCC has no choice but to see that the terms of section 202(a) are observed, even if that entails some modification of the methodologies used to derive the proposed charges.

The FCC's observations that the facilities leased under the SNFAs are "unique," *id.* at ¶ 58, J.A. 800, that these arrangements for sharing multifunction equipment were approved by the District Court after review by the Justice Department, *id.* at ¶ 58 n. 96, J.A. 800, and that they were a "practical necessity," because the only alternative was to require either AT & T or the BOCs needlessly to construct duplicate facilities, *id.* at ¶ 59, J.A. 802, are completely beside the point. Although the District Court approved the SNFAs as a means for dividing extant multifunction facilities between AT & T and the BOCs, it did not examine actual leases or compare charges thereunder with any other set of tariffs. That responsibility fell to the FCC, whose standards are set forth in the Communications Act.[11] The FCC cannot disregard its statutory mandate merely because the District Court found that the concept of dividing property pursuant to the SNFAs "furthered the public interest." *Id.* at ¶ 59, J.A. 802.[12]

### (b) The Distinction Between Facilities and Services

The second reason offered by the FCC on behalf of its finding that no discrimination

---

10. The FCC's description of the two methodologies as "entirely different" also prompts the question how their simultaneous use can be tolerated if, as the FCC asserts, "[i]t is our well established policy that costs should be recovered from cost-causers where feasible." *Id.* at ¶ 58 n. 97, J.A. 801. If both methodologies base charges on costs, then it is hard to conceive of their being "entirely different." If one or more does not, then the FCC's wholesale approval of both is difficult to reconcile with its declaration of agency policy. There may be an explanation for this mystery, but it is not to be found in the FCC's decision.

11. The legality of the SNFAs is not at issue in this case, and we expressly reject AT & T's suggestion that we view MCI's petition as a collateral attack on the District Court's settlement decree. *See* Supplemental Brief of Inter-

venor AT & T at 2–5. What is at stake are the special access tariffs approved in the *Special Access Order.*

12. The importance of the FCC's inspecting the terms of actual SNFAs, as opposed to the model agreements it has on file, along with the ways in which SNFA pricing methodologies are implemented, is highlighted by the fact that the BOCs have concededly *altered* the model agreements submitted with the Plan of Reorganization, *see* page 1299 & note 5 *supra,* and then altered the modified models still further in individual cases. It also bears noting that the FCC apparently never received copies of model SNFAs involving equipment leased by a BOC to AT & T. *See* J.A. 191–97 (describing contents of submissions to the FCC pursuant to FCC request of July 18, 1984).

exists is that the real estate and equipment made available to AT & T under the SNFAs "are in marked contrast to special access services, which consist of an integrated package of equipment and accompanying support (*e.g.*, testing and maintenance) that supplies an end-to-end service capability to customers." *Id.* at ¶ 58, J.A. 802; *see also id.* at ¶ 58 n. 97, J.A. 801. To the extent that AT & T leases facilities under the SNFAs that could be used to provide special access services, it must itself invest in additional equipment, pay for maintenance and testing, and so on, in order to obtain the functional equivalent of the packaged services sold pursuant to tariffs. "Against this background," the FCC says, "it appears to us that differences between the charges, terms and conditions for special access and those for the equipment covered by SNFAs are not unreasonable." *Id.* at ¶ 58, J.A. 802.

The FCC's finding is puzzling. It appears to be premised on the assumption that special access services and at least some facilities leased under SNFAs are *not* "like" services or facilities, and thus cannot be compared for purposes of section 202(a). Not only is this apparent assumption unsupported, however, inasmuch as the FCC never obtained copies of the SNFAs to determine whether equipment leased pursuant to them could be or is used to supply special access services, but the FCC explicitly refused to base its holding on this assumption. The paragraph from which the foregoing quotations are taken begins with the phrase: "Even if we assume *arguendo*, however, that SNFAs and special access are 'like services'...." *Id.* at ¶ 58, J.A. 800. And in the preceding paragraph the FCC stated: "We are ... unpersuaded by AT & T's and the BOCs' claim that SNFAs and special access are not 'like services' because one involves the provision of facilities and the other involves the provision of a service." *Id.* at ¶ 57, J.A. 799. The FCC's reasoning on this point thus borders on incoherence.

Moreover, if the FCC did intend to base its conclusion on a determination that "like" services or facilities are not involved, we could only find it arbitrary. The FCC simply lacked sufficient evidence on which

to ground its claim that "differences between the charges, terms and conditions for special access and those for the equipment covered by SNFAs are not unreasonable." *Id.* at ¶ 58, J.A. 802. Ignorant of the charges and at least some of the special terms and conditions under the SNFAs, the FCC was hardly in a position to make a responsible and informed assessment of their reasonableness vis-a-vis those of the special access tariffs.

(c) *SNFA Charges Are Probably Not Unreasonably Low*

The FCC's third argument for its conclusion that no unreasonable or unjust discrimination exists is hidden in a footnote:

[W]e are not persuaded by MCI's claims that SNFA charges are unreasonably low. Were this the case, one would expect the BOCs to complain, as they would be suffering a loss if MCI's contention were correct. No BOC, however, has raised such a complaint.

*Id.* at ¶ 58 n. 97, J.A. 801. Although the FCC does not make its reasoning explicit, it appears to infer from the assumed fact that SNFA charges are not unreasonably low and the assumed and unchallenged fact that, given the costs of providing such services, special access tariffs are not unreasonably high, that SNFA rates are not unreasonably or unjustly low *by comparison with* special access charges.

This argument, however, involves a *non sequitur*. Even if one assumes that neither special access nor SNFA charges are unreasonable when viewed independently of one another, it does not follow that SNFA charges are not unreasonably or unjustly low relative to corresponding elements of special access tariffs. In order for the FCC to make the *comparative* judgment mandated by section 202(a), it must obtain at least a representative sample of the charges actually assessed under the two pricing schemes and set those charges alongside one another. The FCC has not, however, even requested the data necessary to make such comparisons.

The FCC's assertion that the BOCs' failure to complain about SNFA charges proves that they are not unreasonably low is also questionable. Because the Plan of

Reorganization requires that contract terms be the same, regardless of whether AT & T or a BOC is the lessor, because half of the contracts are leases from AT & T to a BOC and half run the opposite way, and because the number of such leases is large, it can reasonably be assumed that any detriment that a BOC suffered from unduly low fees paid to it as lessor would tend to be offset by corresponding benefits it received as lessee. If gains and losses cancelled out in this way, or if the BOCs came out ahead because the facilities they typically leased to AT & T generated larger profits than those that AT & T generally leased to the BOCs, then the BOCs would have no cause to complain. And AT & T itself would have no reason to protest to the FCC or the District Court if its gains and losses were equal or if its losses exceeded its gains but it still occupied an advantageous position vis-a-vis competitors forced to pay special access tariffs and if, in the latter case, it feared that such protests would result in the loss of its competitive advantage. The FCC's inference is therefore weak and unsupported. Only by collecting information about the terms of the SNFAs could it determine whether SNFA charges are in fact reasonable. And, in any event, the agency would still have to compare those charges with corresponding elements of the special access tariffs to ensure that the requirements of section 202(a) have been met.

### (d) *SNFAs Are Transitional Devices*

The FCC's fourth reason for finding that no unreasonable or unjust discrimination exists is, like the third, stated in an offhand manner in a footnote:

> Our decision is buttressed by the fact that, by the terms of the [court-approved antitrust settlement], SNFAs are temporary transitional mechanisms which must be terminated by 1991. The record indicates that AT & T and the BOCs have already terminated a number of these agreements, which seems to indicate that neither party to the contracts perceives them to be especially beneficial.

*Id.* at ¶ 59, n. 98, J.A. 802.

Once again, however, the FCC's reasoning is not compelling. First, nothing in the

Plan of Reorganization approved by the District Court requires that the SNFAs be terminated in 1991. The Plan states that AT & T and the BOCs will cease sharing facilities "as promptly as is reasonably feasible," but it establishes no timetable. J.A. 42. In its brief to this court, AT & T claims that all of the SNFAs will be terminated no later than 1991, Supplemental Brief of Intervenor AT & T at 2, but this statement of intention does not have the status of a legal obligation.

Second, the fact that many SNFAs have already been discontinued may suggest, as the FCC says, that those agreements were not especially beneficial. But the termination of some unprofitable leases does not imply that those SNFAs that have been kept alive do not confer an unreasonable or unjust advantage on AT & T vis-a-vis other interexchange carriers.

Third, the FCC notes in its brief that this court has upheld FCC decisions allowing carriers to charge possibly discriminatory rates as part of a transitional mechanism to "shift from one type of nondiscriminatory rate structure to another," in order to "preserv[e] the efficient operation of the interstate telephone network during the interim." *National Ass'n of Regulatory Utility Comm'rs v. FCC*, 737 F.2d 1095, 1135–36 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1227, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985); *see also Western Union Tel. Co. v. FCC*, 815 F.2d 1495, 1505 (D.C.Cir.1987). Both of the cases cited by the FCC, however, involved the gradual implementation of large rate increases to avoid disruption in service while carriers adjusted to the new rates. Furthermore, the FCC has not found that the concerns that motivated those decisions are in evidence in this case. The resultant disparities in those cases, moreover, declined over a period of months; they did not, as here, continue for up to eight years. Finally, it warrants repeating that the reasonableness of transitional rate disparities turns on their magnitude as well as their duration. In the two cases cited by the FCC, the amount of the disparity

was known to the FCC, which adjudged it reasonable in light of the harms that might well flow from sudden rate increases. In this case, the FCC has not gathered the information necessary to measure whatever disparity exists between SNFA charges and correlative elements of the special access tariffs. It is therefore not yet in a position to declare those temporary disparities reasonable and just.

### 2. Order on Remand

The FCC's explanation of why the special access tariffs it approved were permissible under section 202(a) in light of the amounts charged to AT & T under the SNFAs was, for the foregoing reasons, confused, conclusory, and uncompelling. On remand, we expect the FCC to employ some reasonable version of the three-stage analysis we described above. First, the FCC must determine, generally, whether some or all facilities available to AT & T under the SNFAs are "like" facilities that are used to provide special access services. Where the facilities are alike, the FCC must devise some reasonable mechanism to assess amounts paid under the two pricing schemes to determine whether some tariffs are discriminatory by comparison with their SNFA counterparts. Finally, if discrimination exists, the FCC must decide whether it is just and reasonable.

In order to perform this analysis, the FCC must of course obtain copies, or a reasonable sampling, of the SNFAs and lists of charges paid by AT & T pursuant to them. We do not mean to suggest that the FCC must require that a copy of every SNFA and every set of monthly charges be filed with the agency, or even that a copy of every extant SNFA involving "like" facilities be submitted. Consideration of a meaningful sample of the SNFAs will probably suffice. We will leave it to the FCC to devise an appropriate investigation to ensure that interexchange carriers other than AT & T are not being forced to pay unjustly or unreasonably discriminatory rates.

As the FCC has recognized, *see Investigation of Access and Divestiture Related Tariffs,* FCC 86–54 (Jan. 24, 1986), *reprinted in* J.A. 829, the BOCs bear the burden under 47 U.S.C. § 204(a) of justifying the special access tariffs at issue. Perfect parity of charges is not necessary to meet the test of section 202(a), but the FCC must articulate with precision its reasons for tolerating any discrepancies it uncovers. *See, e.g., Public Media Center v. FCC,* 587 F.2d 1322, 1332 (D.C.Cir.1978). Finally, if the FCC wishes to avail itself of any of the reasons it invoked in its *Special Access Order,* it must address any relevant questions or criticisms this opinion advances.

### III. CONCLUSION

Because we find that the FCC acted arbitrarily and capriciously in ruling that the special access tariffs it approved are not unjustly or unreasonably discriminatory in view of SNFA charges, we grant MCI's petition for review and remand for further proceedings consistent with this opinion.

*So ordered.*

BUCKLEY, Circuit Judge, dissenting in part:

I concur in all but one aspect of the majority opinion, and that is its conclusion that MCI had failed, in the agency proceedings, to assert its claim that section 211 required that SNFAs be filed with the FCC. My reading of the record suggests the contrary.

The majority cites ambiguous language from the MCI Opposition to Direct Cases ("Opposition") in support of its position that MCI had failed to raise the issue because it did not make specific reference to subsection 211(a) (which requires the filing of certain contracts), thereby leaving the FCC in doubt as to whether MCI was merely requesting that it exercise its discretion, under subsection 211(b), to require the filing of "other contracts." Maj. op. at 1302. MCI made it clear in language the majority did not quote that it considered the filing of the SNFAs to be mandatory: "With these exclusive and discriminatory arrangements placed in tariffs or contracts on file at the FCC, the public will be able to exercise its *statutory right* to scrutinize these arrangements. 47 U.S.C. §§ 203, 204, and 211." Opposition at 6, J.A. at 448 (emphasis added.) It seems self-evident that the public can only exercise a statutory right to scru-

tinize contracts if those contracts are required by statute to be filed.

I am unimpressed by the argument that because MCI had failed to underscore the obvious, it failed to provide the FCC with "reason to address the question whether SNFAs had to be filed pursuant to section 211(a)." Maj. op. at 1302. Accordingly, I would have required the FCC to address the issue on remand.