MCI TELECOMMUNICATIONS
CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

American Telephone and Telegraph Com-
pany, Mountain States Telephone and
Telegraph Company, US Sprint Com-
munications Company Limited Part-
nership, ITT Communications Services,
Inc., Competitive Telecommunications
Association, Independent Data Commu-
nications Manufacturers Association,
Inc., Southwestern Bell Telephone
Company, Ad Hoc Telecommunications
Users Committee, Intervenors.

US SPRINT COMMUNICATIONS COM-
PANY LIMITED PARTNERSHIP,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

American Telephone and Telegraph Com-
pany, MCI Telecommunications Corpo-
ration, Mountain States Telephone and
Telegraph Company, et al., ITT Com-
munications Services, Inc., Competitive
Telecommunications Association, Inde-
pendent Data Communications Manu-
facturers Association, Inc., Southwest-
ern Bell Telephone Company, Ad Hoc
Telecommunications Users Committee,
Intervenors.

INDEPENDENT DATA COMMUNICA-
TIONS MANUFACTURERS
ASSOCIATION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

US Sprint Communications Company
Limited Partnership, MCI Telecommu-
nications Corporation, Ad Hoc Tele-
communications Users Committee,
Mountain States Telephone and Tele-
graph Company, et al., ITT Communi-
cations Services, Inc., Southwest-
ern Bell Telephone Company, Competi-
tive Telecommunications Association,
American Telephone and Telegraph
Company, Intervenors.

INDEPENDENT DATA COMMUNICA-
TIONS MANUFACTURERS
ASSOCIATION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

US Sprint Communications Company
Limited Partnership, Illinois Bell Tele-
phone Company, Indiana Bell Tele-
phone Company, Inc., Michigan Bell
Telephone Company, The Ohio Bell
Telephone Company, and Wisconsin
Bell, Inc. (Ameritech Operating Compa-
nies), MCI Telecommunications Corpo-
ration, American Telephone and
Telegraph Company, Ad Hoc Telecom-
munications Users Committee, Interna-
tional Business Machines Corporation,
Southwestern Bell Telephone Company,
Intervenors.

WILLIAMS TELECOMMUNICATIONS
GROUP, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Independent Data Communications Man-
ufacturers Association, Inc., Ad Hoc
Telecommunications Users Committee,
US Sprint Communications Company
Limited Partnership, International
Business Machines Corporation, Ameri-
can Telephone and Telegraph Compa-

ny, Southwestern Bell Telephone Company, Intervenors.

Nos. 89–1382, 89–1384, 89–1390, 89–1695 and 89–1733.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1990.

Decided Oct. 23, 1990.

As Amended Oct. 23, 1990.

and Donald J. Elardo were on the brief, for MCI Telecommunications Corp., petitioner in No. 89–1382, and intervenors in Nos. 89–1384, 89–1390, and 89–1695.

Herbert E. Marks, with whom David Alan Nall was on the brief, for Independent Data Communications Mfrs. Ass'n, Inc., petitioner in Nos. 89–1390 and 89–1695, and intervenors in No. 89–1733.

Leon M. Kestenbaum and H. Richard Juhnke were on the brief for US Sprint Communications Co. Ltd. Partnership, petitioner in No. 89–1384, and intervenors in Nos. 89–1390, 89–1695 and 89–1733. Michael B. Fingerhut also entered an appearance.

William L. Fishman and Eric Fishman were on the brief for petitioner Williams Telecommunications Group, Inc. in No. 89–1733.

John E. Ingle, Deputy Associate Gen. Counsel, with whom Robert L. Pettit, Gen. Counsel, Jane E. Mago and Laurence N. Bourne, Counsel, F.C.C., James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and Robert J. Wiggers, Attys., Dept. of Justice, were on the brief, for respondents in all cases. Daniel M. Armstrong, Atty., F.C.C., also entered an appearance for respondents.

David W. Carpenter, with whom Gene C. Schaerr and Francine J. Berry were on the brief, for intervenor AT & T in Nos. 89–1384, 89–1390, 89–1695 and 89–1733. David J. Lewis, Michael J. Morrissey, and Albert M. Lewis also entered appearances for intervenor.

Genevieve Morelli, W. Theodore Pierson, Jr., and Robert J. Aamoth were on the brief for intervenors Competitive Telecommunications Ass'n and Communications Services, Inc. in No. 89–1384. James M. Smith also entered an appearance for intervenors.

Anthony C. Epstein, with whom Chester T. Kamin, Thomas S. Martin, Michael H. Salsbury, Carl S. Nadler, John M. Scorce,

Dana A. Rasmussen and Robert B. McKenna for the Mountain States Tele-

phone and Telegraph Co., et al.; William C. Sullivan, Richard C. Hartgrove, and Joseph E. Cosgrove, Jr. for Southwestern Bell Telephone Co.; Floyd S. Keene and Alfred Winchell Whittaker for Illinois Bell Telephone Co., et al., were on the joint brief for intervenors in Nos. 89–1384, 89–1390, 89–1695 and 89–1733. Patricia J. Nobles also entered an appearance for intervenors.

James S. Blaszak, Patrick J. Whittle, and Kevin S. DiLallo were on the brief for intervenors Ad Hoc Telecommunications Users Committee in Nos. 89–1382, 89–1384, 89–1390, 89–1695 and 89–1733.

W. Theodore Pierson, Jr., James M. Smith, and John A. Ligon entered appearances for intervenor ITT Communications Services, Inc. in Nos. 89–1384 and 89–1390.

J. Roger Wollenberg, William T. Lake, and Carl Willner entered appearances for intervenor Intern. Business Machines Corp. in Nos. 89–1695 and 89–1733.

Before MIKVA, EDWARDS and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

MCI Telecommunications, US Sprint, Williams Telecommunications, and Independent Data Communications Manufacturing Association ("IDCMA") petition for review of an order by the Federal Communications Commission concerning the lawfulness of a tariff filed by AT & T. We grant the petition in part.

### I.

This case involves four of AT & T's "Tariff 12" (or "integrated service package" or "VTNS") offerings which are composites of different individually-tariffed AT & T telecommunications services. The specific services, service amounts, and rates for each package are arrived at through negotiation between AT & T and a particular customer, each of whom is a large corporation. The rates for the package are lower than the aggregate rates the custom-

ers would have paid had they purchased each service individually from AT & T, but the customer generally commits to accepting the service package on a long-term basis and sacrifices the flexibility of determining exactly how AT & T will provide service. Non-dominant carriers—petitioners included, we are told—offer integrated service packages to large users in competition with AT & T.

The four options at issue here were filed as tariffs in accordance with the FCC requirement that AT & T offer telecommunications services only in this manner, *see* 47 U.S.C. § 203 (1988). Each tariff designated the services constituting the package and the rate to be charged and also restricted the package's availability to certain areas of the nation. Shortly after each tariff was filed, petitioners asked the FCC to reject it as unlawful, or alternatively to suspend it and investigate its lawfulness. The FCC concluded that each tariff was not so patently unlawful as to warrant rejection but that certain issues regarding the tariffs merited further investigation. *See AT & T Communications, Tariff F.C.C. Transmittal Nos. 1018 and 1102 No. 12, Memorandum Opinion and Order,* 3 F.C.C.Rcd 995 (Feb. 9, 1988) (*"February 9 Order"*); *AT & T Communications, Revisions to Tariff F.C.C. No. 12, Memorandum Opinion and Order,* 3 F.C.C.Rcd 2837 (Apr. 28, 1988); *AT & T Communications, Revisions to Tariff F.C.C. No. 12, Memorandum Opinion and Order,* 4 F.C.C.Rcd 811 (Oct. 28, 1988); *AT & T Communications, Revisions to Tariff F.C.C. No. 12, Memorandum Opinion and Order,* 4 F.C.C.Rcd 1342 (Jan. 27, 1989).

The Commission accordingly set the tariffs for a hearing (under 47 U.S.C. § 204 (1988)), and designated for inquiry, *inter alia,* the questions: whether the lower rates charged for the integrated packages constitute an unreasonable discrimination in provision of like communication service, whether the tariffs comply with the FCC's *Private Line Rate* guidelines (located at 47

C.F.R. Part 61.40), and whether integrated packages comport with the FCC's policies of encouraging resale of telecommunications services. *See February 9 Order,* 3 F.C.C.Rcd at 998–99. The FCC permitted the tariffs to remain in effect pending the outcome of the hearing.

After reviewing the tariffs, AT & T's direct case, petitioners' opposition, and comments from numerous interested parties, but declining to examine the contracts between AT & T and its customers, the FCC issued an order declaring each tariff unlawful. *See AT & T Communications, Revisions to Tariff F.C.C. No. 12, Memorandum Opinion and Order,* 4 F.C.C.Rcd 4932 (Apr. 18, 1989) (*"April 18 Order"*). The Commission focused primarily on the question whether or not the integrated service packages and an aggregation of their component services are "like communications services" within the meaning of Section 202 of the Communications Act, 47 U.S.C. § 202 (1988) (if services are "like," any unreasonable price disparity between them is prohibited).

The Commission determined that the two are not "like," and consequently that AT & T did not have to justify the lower prices for the integrated packages. It rejected petitioners' contention that the different offerings were essentially the same because a customer receives exactly the same communications capabilities and technology whether it purchases the services separately or in integrated form. It held instead that integrated packages are functionally different, reasoning that AT & T retains the flexibility to alter "the particular proportion of separately tariffed component services" and the facilities used to provide them without changing the price or informing the customer; that AT & T can isolate and respond to system trouble more easily when it sells services as a package and can eliminate duplicative engineering and administrative reviews by not selling each service separately; that the large volume involved in integrated packages results in cost savings to AT & T; and that customers perceive a difference between the two services, both because integrated service packages allow them to avoid the management and transaction costs associated with piecing together a communications system from individual services and overseeing that system and because integrated service packages offer greater price stability but entail longer commitments than individual services. *See April 18 Order,* 4 F.C.C.Rcd at 4936–37.

The FCC did determine that the packages are like *each other* and consequently that AT & T had to demonstrate that the price disparities *among the different packages* were not unreasonable. It decided this last issue rather cursorily, however, noting only that the difference in the services comprising each package "account for differences among customers' bills or differences among packages in pricing." *April 18 Order,* 4 F.C.C.Rcd at 4938.

The Commission flatly rejected the contention of one petitioner, that integrated packages are *per se* violations of the nondiscrimination requirement of the Communications Act, *see* 47 U.S.C. § 202(a), merely because they are based on contractual negotiations with a single customer and are specifically designed to meet the needs of only that customer. Relying upon our decision in *Sea–Land Service, Inc. v. ICC,* 738 F.2d 1311 (D.C.Cir.1984), it held that integrated packages could be consistent with a carrier's non-discrimination duty if the carrier then made the package "generally available" to all potential customers with the same or similar communications needs. *April 18 Order,* 4 F.C.C.Rcd at 4938–39. Each Tariff 12 option contained geographical restrictions on availability, however, and for that reason alone the FCC determined that AT & T had not made them generally available and that they were thus unlawful. It allowed AT & T to continue providing the integrated service but required it either to refile the tariffs without the geographical restrictions or to withdraw the service within 30 days.

By striking down the tariffs on the geographical restriction ground, the FCC

avoided deciding whether the tariffs would have been sufficiently "generally available" in the absence of those restrictions, and did not reach the other questions it had designated for investigation. Instead, it listed "guidelines" for future integrated offerings directed primarily to the efforts carriers must make so that these offerings are "generally available." *April 18 Order*, 4 F.C.C.Rcd at 4939. In a footnote, it also warned that future offerings must also comply "with our existing tariff requirements and policies, including our prohibition against unreasonable restrictions on resale." *Id.* at 4944 n. 69. The FCC did not mention the *Private Line Rate* guidelines issue which, it will be recalled, was also designated for investigation.

AT & T quickly removed the geographic restrictions and refiled the tariffs. The Commission allowed them to go into effect without further proceedings.

The Commission denied petitioners' motion for reconsideration of its order. *See AT & T Communications, Revisions to Tariff F.C.C. No. 12, Memorandum Opinion and Order on Reconsideration*, 4 F.C.C.Rcd 7928 (Nov. 8, 1989) (*"Reconsideration Order"*). It rejected the claim that, as it had not reviewed the contracts upon which the tariffs were based, it had not compiled an adequate record, explaining that the relevant information was in the tariffs, not the contracts. *Id.* at 7930. The Commission justified its decision not to reach the questions whether the tariffs complied with the FCC resale policies and the *Private Line Rate* on the grounds that it had declared them unlawful due to the geographic restrictions. It did state that, in any event, compliance with the *Private Line Rate* guidelines is not a prerequisite to lawfulness. *Id.* And it rejected the argument that integrated service packages violate its *Computer II* rules. *Id.* at 7930–31.[1]

Subsequently, the FCC declined to investigate numerous AT & T tariff filings for integrated service packages. Sprint has filed a complaint with the FCC pursuant to 47 U.S.C. § 208 (1988) charging that AT & T's integrated offerings violate the Communications Act and generally raising the issues that the Commission reserved in its *April 18 Order* and its *Reconsideration Order*. AT & T has likewise filed a complaint charging that the non-dominant carriers' integrated offerings are illegal on the same grounds. These complaint proceedings have not yet concluded.

Under the present regulatory regime, only AT & T, among the interexchange carriers, must file its rates as tariffs, although all carriers are subject to the statutory requirement that their rates be not unduly discriminatory. The Commission, in another proceeding, is reexamining the economic assumption which governs this regulatory approach—that AT & T, as the dominant carrier, has market power and therefore must be required to file its rates openly as tariffs. *See American Tel. & Tel. Co. v. MCI Telecommunications Corp.*, No. E–89–297 (FCC). Of course, the present regulatory situation presents advantages to AT & T's competitors, who can urge the FCC to suspend or investigate the tariffs or file complaints against AT & T based, presumably, on better information than is available to AT & T concerning their competitor's practices.[2] But the propriety of this asymmetrical regulatory system is not before us.

## II.

The FCC and AT & T challenge our jurisdiction on the grounds that the petitioners lack standing and that petitioners seek review of non-final orders. We reject both jurisdictional arguments.

## A.

■ The primary attack on petitioners' standing is on prudential grounds, that, as

---

1. The *Computer II* rules require common carriers to make their service offerings compatible with customer-premises equipment (CPE) sold by other companies.

2. They can also use this superior information to enhance their ability to market their integrated offerings.

AT & T's competitors, they do not fall within the "zone of interests" protected by the communications statute. *See generally Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982) (noting that one of the "prudential principles that bear on the question of standing" is whether a plaintiff falls within the "zone of interests" protected by the statute on which he relies). Under *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987), which relaxed the "zone of interest" test, it is no longer necessary for petitioners to show that they are among the class that Congress affirmatively sought to benefit in enacting the statute. Still, we must deny standing if the interests petitioners seek to advance is only marginally related to the statutory concern or actually contrary to the statutory purpose. *See National Fed'n of Federal Employees v. Cheney,* 883 F.2d 1038, 1043–52 (D.C.Cir.1989).

The Commission and AT & T claim that the interest petitioners assert is, like in *Cheney,* actually contrary to the purpose of the Communications Act, which they maintain is designed to protect consumers against discrimination and not competitors from competition. Respondents rely upon antitrust cases such as *Cargill, Inc. v. Montfort of Colorado,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1987), which hold that competitors may not rely on an injury caused by increased competition to challenge a merger between competitors under the Clayton Act because that very increased competition is what the antitrust laws seek to promote. They argue that under the Communications Act there is a similar incongruity between the interests of consumers and competitors.

It is not clear to us that competitors in a regulated or quasi-regulated industry should be equated to competitors in a free market for standing purposes, but it is unnecessary to decide that question in this case. Even under *Cargill,* a competitor has standing when it can credibly allege that the merger would result in predatory competition, because *that* behavior could result in an injury that the antitrust laws were designed to prevent. *See* 479 U.S. at 121, 107 S.Ct. at 495. The key to a showing of predation is a demonstration of market power. And it would appear that the premise of the present regulatory regime governing the interexchange carrier market is that AT & T, as the dominant carrier, has market power and is therefore capable of predatory behavior. It is presumably for that reason that AT & T alone, among the carriers, must file tariffs. Since this AT & T-only tariffing requirement is quite obviously designed in part to protect competitors, on the assumption that only such protection can ensure competition in this unusual market, it cannot be said that petitioners, as competitors, are necessarily asserting interests contrary to consumers in challenging AT & T's tariffs. Like *Cargill*'s hypothetical plaintiffs complaining about predatory competition, petitioner's interests presumably are not adverse to consumers; thus, they fall within the zone of interests protected by the Communications Act.

**B.**

■ We have jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1) to review only "final orders" of the FCC. In the FCC's and AT & T's version of events below, the only final order the Commission issued was its determination that the Tariff 12 options are unlawful due to geographic restrictions on their availability; they view everything else the FCC did as "subsidiary" to that final order. Respondents thus maintain that *only* the geographic restriction holding is now subject to review. As that holding was in petitioners' favor, the FCC and AT & T describe them as having "won" before the FCC and claim that they cannot seek review to complain about the grounds on which they "won."

This description—both of which findings of the FCC were subsidiary and of who won below—is in our view quite mislead-

ing. The major issue in this case is clearly whether integrated service packages are "like" an aggregation of their component services purchased individually so that price differences between the two have to be justified by the carrier as reasonable. The FCC itself described this as the "core question" in the dispute. *April 18 Order*, 4 F.C.C.Rcd at 4932. And the FCC clearly reached a conclusion on this issue, a conclusion which it does not appear to be inclined to reconsider and which runs squarely counter to petitioners' interests. By contrast, the holding that the Tariff 12 options were unlawful due to geographic restrictions was easily correctable; indeed, the FCC allowed AT & T to continue to provide the service packages pending refiling of the tariffs and conceded at argument that it fully expected AT & T simply to lift the restrictions, *see* Tr. at 43. Any victory petitioners won below was thus fleeting at best.

This case is far different from *American Tel. & Tel. Co. v. FCC*, 602 F.2d 401 (D.C. Cir.1979), upon which the FCC and AT & T heavily rely. There, we refused to grant AT & T's request that we review not the FCC's order setting aside a tariff but one of the factual findings which served as an alternate basis for that order. The finding AT & T sought to challenge would not independently have constituted a violation and was conceded to be *dictum* having no relevance to either the FCC's holding or its remedy. *See id.* at 407 & n. 35. We viewed AT & T as asking us "selectively to excise from the order's foundation certain portions it finds objectionable" and concluded that "Sections 402(a) and 2342 [do not] authorize us to embark on architectural revisions of this sort." *Id.* at 407.

Here, in contrast, the rulings petitioners challenge are far from *dicta:* they will have binding effect on future integrated offerings and the FCC anticipated that its holding in petitioners' favor would merely postpone that effect. In such situations, we have jurisdiction to review the rulings. *See, e.g., Meredith Corp. v. FCC*, 809 F.2d 863, 868–69 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990). Any other approach would permit the FCC to insulate from our scrutiny legal decisions of major consequence simply by embedding them in orders which are technically favorable to erstwhile petitioners but which are easily correctable on minor grounds.[3]

### III.

The FCC made three determinations in the *April 18 Order:* that integrated service packages do not *per se* violate Section 202 of the Communications Act; that the service packages are not "like" an aggregation of their component services purchased individually; and that the service packages are "like" each other and AT & T had discriminated illegally in their provision. Petitioners challenge the first two directly and an aspect of the third. We review FCC orders "in the manner prescribed by section 706 of Title 5 [the Administrative Procedure Act]," 47 U.S.C. § 402(g) (1988), and therefore ask whether the FCC's holdings are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988).

### A.

IDCMA first attacks the raison d'etre of Tariff 12 services, arguing that rates arrived at through contractual negotiations

---

**3.** We note that Congress recently has expressed concern about the FCC's practice of effectively insulating from review decisions that tariffs are lawful. Such concerns prompted Congress to add subparagraph (a)(2)(C) to Section 204 of the Communications Act, which provides that "[a]ny order concluding a hearing under this section shall be a final order and may be appealed under section 402(a) of the title," 47 U.S.C. § 204(a)(2)(C). *See generally* Statement of Sen. Inouye, *reprinted at* 1988 U.S.Code Cong.

& Admin.News 4103, 4111, 4111–12. While this language does not necessarily dictate that all findings within an order are subject to review, it certainly manifests a congressional intent that review of FCC tariff rulings be expedited and that petitioners not be required "to hurdle an unreasonable number of regulatory barriers prior to obtaining judicial review." Statement of Sen. Inouye, *reprinted at* 1988 U.S.Code Cong. & Admin.News at 4112.

between a carrier and an individual customer *per se* violate the Communications Act's anti-discrimination provisions.[4] The FCC relied upon our decision in *Sea–Land Service, Inc. v. ICC,* 738 F.2d 1311 (D.C.Cir. 1984), in holding that AT & T may charge contract rates if it files them as tariffs and makes them generally available to all customers desiring the same or similar service. *See April 18 Order,* 4 F.C.C.Rcd at 4938.

In *Sea–Land,* we concluded that the almost identical non-discrimination provisions of the Interstate Commerce Act (ICA), 49 U.S.C. § 10741—upon which the non-discrimination provisions of the Communications Act were based—did not preclude railroad carriers from contracting for rates with individual customers if they then filed the contracts with the ICC and made the rates available to any shipper willing and able to meet the contractual terms. *See* 738 F.2d at 1316–19. We distinguished previous cases indicating that carriers could not set rates in this manner on the ground that these cases relied not on the *substantive* requirements of the ICA anti-discrimination provisions but solely on the ICC's failure to provide a *procedural* mechanism for filing private contracts. *See id.* at 1316–18. In the absence of such a procedure, the contract rates could not be charged; the ICA permits carriers to charge only a *filed* rate, *see, e.g., Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* —— U.S. ——, 110 S.Ct. 2759, 2765–66, 111 L.Ed.2d 94 (1990). But, as the ICC had recently changed its policy to allow filing of carrier-shipper contracts, we saw no further impediment to contract rates. *See Sea–Land,* 738 F.2d at 1317–18.

The Communications Act, of course, was based upon the ICA and must be read in conjunction with it. *See, e.g., American Broadcasting Co., Inc. v. FCC,* 643 F.2d 818, 820–21 (D.C.Cir.1980); *Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221, 1234–35 (D.C.Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981); *Ad Hoc Telecommunications Users Comm. v. FCC,* 680 F.2d 790, 805–07 (D.C.Cir.1982) (MacKinnon, J., concurring in the result). Nevertheless, IDCMA maintains that the FCC's reliance on *Sea–Land* was misplaced. It does not, however, contend that the Communications Act imposes any greater substantive anti-discrimination requirements than does the ICA. Under *Sea–Land* then, rates arrived at through negotiations between a carrier and an individual customer and then made generally available to other similarly situated customers do not *per se* violate the Communications Act if the rates are filed with the FCC. IDCMA's principal argument focuses on this last requirement: it claims that the FCC, unlike the ICC, either cannot establish or has not appropriately established the procedural mechanism for filing private contracts found necessary in *Sea–Land.* This misses the point. What is involved here is not the filing of contracts *qua* contracts but the filing of *tariffs based upon contracts.*[5] There thus is no need for the FCC to devise a new means for public filing of the rates for Tariff 12 services; the filing occurs through the normal tariffing process. And there is no *procedural* bar to a carrier's formulating a proposed tariff based upon negotiations with a potential customer.

---

**4.** Implicit in this argument is the belief that the Act allows carriers to do business with non-carriers only through tariffs filed with the FCC and not generated in reference to a particular customer. As IDCMA conceded at argument, Tr. at 29–30, the logical extension of its submission is that all carriers—including non-dominant ones—must file tariffs and that the current FCC policy of requiring only AT & T to do so is illegal, a proposition with which we doubt IDCMA's co-petitioners would agree. In light of this, we find it somewhat odd that Sprint joined IDCMA's brief on this point.

**5.** By contrast, the carriers in *Sea–Land* and in the previous cases disallowing contract rates attempted to file actual contract documents, a practice that the ICA's technical filing requirements could not before the ICC's policy change accommodate. *See Sea–Land,* 738 F.2d at 1312–13, 1316, 1318 n. 11; *see also Sea–Land Service, Inc. v. ICC,* 697 F.2d 1166, 1167–68 (D.C.Cir. 1983). Here, AT & T has not sought to file the contracts themselves; petitioners in fact complain at length that the FCC has never seen the contracts. *See infra* Part III.B.

B.

We turn to the core issue in this case: whether a carrier must justify a lower rate it charges for integrated packages than for an aggregation of the individually-tariffed services comprising the packages. Petitioners claim that the lower rates violate Section 202 of the Act, which provides that "[i]t shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges ... for ... like communication service." 47 U.S.C. § 202(a).

■ A charge that a carrier has discriminated in violation of this section entails a three-step inquiry: (1) whether the services are "like"; (2) if they are "like," whether there is a price difference; and (3) if there is a difference, whether it is reasonable. *See MCI Telecommunications Corp. v. FCC*, 842 F.2d 1296, 1303 (D.C.Cir. 1988). If the services are "like," the carrier offering them has the burden of justifying the price disparity as reasonable. *See, e.g., American Broadcasting Co. v. FCC*, 663 F.2d 133, 139 (D.C.Cir.1980) ("*ABC*"). The FCC held that integrated service packages are not "like" the component services purchased individually, and consequently spared AT & T this burden. Petitioners challenge this determination as arbitrary and capricious.

As the FCC noted in its *April 18 Order*, likeness within the meaning of Section 202(a) turns upon the "functional equivalency" test, which "focuses on whether the services in question are 'different in any material functional respect.'" *Ad Hoc*, 680 F.2d at 795 (*quoting American Trucking Ass'n v. FCC*, 377 F.2d 121, 127 (D.C. Cir.1966), *cert. denied*, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967)). We have said in applying this test that the FCC must "look to the nature of the services offered" and determine if customers perceive them as performing the same functions. *ABC*, 663 F.2d at 139; *accord Ad*

*Hoc*, 680 F.2d at 795–97. If "customers regard[ ] the ... service as the same, with cost considerations being the sole determining criterion," the services are like. *ABC*, 663 F.2d at 139; *accord Ad Hoc*, 680 F.2d at 797.

■ We have also made crystal clear (we thought) what the FCC must *not* examine when applying the functional equivalency test: "[c]onsideration of cost differentials and competitive necessity are properly excluded [from the likeness determination] and introduced only when determining whether the discrimination is unreasonable or unjust." *ABC*, 663 F.2d at 139; *see also Western Union Int'l, Inc. v. FCC*, 568 F.2d 1012, 1019 n. 15 (2d Cir.1977), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978). Pricing differences *a fortiori* cannot be a basis for finding the services unlike—otherwise, the very discrimination Section 202 attempts to prevent would be the grounds for finding that section inapplicable.

Much of the FCC's explanation for its conclusion that integrated service packages are not like the sum of their parts appears to rest securely upon these forbidden considerations. It would seem that the Commission committed legal seppuku. In paragraph 50 of its *April 18 Order*, for example, the Commission reasoned that the larger volume involved in integrated packages results in lower costs of production to the carrier and seemed to believe that these lower costs might distinguish "otherwise similar commodities." *Id.* at 4937. In the next paragraph, it stated that customers perceive the services as different because integrated packages are sold at a fixed, stable price. *Id.* And we cannot tell from the FCC's order whether it considered that portion of its explanation which is arguably not cost- or price-based to be independent of the impermissible factors and a sufficient basis for its conclusion in their absence.[6] We consequently cannot affirm

---

6. At oral argument, the FCC's counsel tried bravely to explain and justify the Commission's reliance on costs (and price stability, which he admitted was largely a proxy for cost). One reason, he began, in which integrated offerings are unlike their component parts is that integrated offerings permit the customer to avoid the costs and pitfalls of managing its own communications system, much in the way a general contractor permits an owner to avoid the costs

the FCC's likeness determination, because an agency order is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Accordingly, we remand the likeness issue with directions that the FCC resolve it without regard for differentials in cost to the carrier and price to the customer. We express no opinion as to the permissibility or validity of the other justifications given by the FCC or whether they, standing alone, would be sufficient to support a determination that the services are not like.

■ Petitioners also claim that the FCC cannot resolve the likeness issue without requiring AT & T to file in the administrative record at least some of the actual contracts upon which the integrated package tariffs are based. In our view, the FCC can decide whether the two services are like without reviewing the contracts (although, if it decides on remand that the services are like, it will most probably need the contracts in the record to determine whether the price differences are reasonable). Petitioners' fundamental position on likeness is that *no matter what services are included in an integrated package*, that package is "like" an aggregation of its constituent parts. The exact specifications of each package as detailed in the contracts

are consequently irrelevant, and therefore we do not see what information the FCC would gain from reviewing them.[7]

### C.

Although the FCC concluded that integrated service packages are not like their constituent parts, it did determine that the integrated packages—despite differences in the service mixes—are like each other. That determination has not been appealed. In the course of making it, however, the Commission mentioned that while the differences in type and quantity of services in each package did not make the packages unlike, they did "account for differences among customers' bills or differences among packages in pricing." *April 18 Order*, 4 F.C.C.Rcd at 4938. Petitioners interpret this somewhat cryptic statement as the FCC's resolution of the third step of the Section 202 analysis—whether the price differences between like services were unreasonable. They claim that the FCC committed an additional reversible error in treating this issue in such a cursory manner. The FCC views the matter differently; it claims that, having decided that the packages at issue were unlawful on other grounds, it did not reach the price differential issue, and that its statement is merely a recognition that service differences *could* justify the price disparity between packages.[8]

and pitfalls of overseeing construction. This "functional difference" could be thought to ascribe to integrated offerings an *added value* over that of the component parts; integrated offerings, however, are priced *lower* than those parts. The FCC was thus led, we are told, to explain the lower price in terms of lower costs in order to keep this asserted "functional difference" from seeming a cover for volume discounting. We of course cannot rely on counsel's *post hoc* assurances that the Commission's relied on costs merely to demonstrate the rationality of other, arguably legitimate, differences.

7. Petitioners rely heavily on our decision in *MCI*, 842 F.2d 1296, where we held that the FCC had to obtain copies of actual lease agreements between the BOCs and AT & T before determining whether the BOCs had unreasonably discriminated in AT & T's favor in the provision of equipment. But the agreements there bore on

whether the services were like. The comparison in *MCI* was between special access tariff services provided by BOCs to non-dominant carriers and leases by BOCs to AT & T of equipment capable, in conjunction with other equipment and labor, of achieving that service. These services (unlike the ones at issue here) were thus not susceptible to "direct comparison," *id.* at 1299 n. 6, and it was necessary for the FCC to examine exactly what equipment was being leased to determine how much of its own technology or equipment AT & T had to add to achieve the service being sold to the non-dominant carriers. *See id.* at 1305.

8. The FCC also claims that MCI and Williams have waived this issue by not raising it below. Sprint, however, did raise it before the FCC, and the implication in the FCC's brief that only MCI and Williams have pressed the issue before this court is, at the very least, misleading.

■ Because we are remanding, we need not decide what the FCC meant. We note simply that both sides are correct: the FCC is right that the service differences *can* justify price disparity, and petitioners are right that the FCC's statement would not be a sufficient explanation. "Perfect parity of charges is not necessary to meet the test of section 202(a), but the FCC must articulate with precision its reasons for tolerating any discrepancies it uncovers." *MCI*, 842 F.2d at 1307. In order to adjudge whether price discrimination is reasonable under Section 202(a), the FCC must compare "the charges actually assessed under the two pricing schemes" and the "terms" of each arrangement. *Id.* at 1305. It may declare the disparate charges lawful only if "there is a neutral, rational basis underlying [the disparity]." *National Ass'n of Reg. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1133 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1227, 105 S.Ct. 1225, 84 L.Ed.2d 364 (1985). The FCC's terse comment, whatever it was intended to mean, gives us no confidence that this analysis has yet been done.[9] And the FCC must do this on remand before it may declare the tariffs lawful—having found the services to be like, it cannot then abort the Section 202 inquiry unless it finds the tariffs unlawful on other grounds.[10]

## IV.

■ As the FCC found the Tariff 12 options unlawful due to the geographic restrictions on their availability, it opted not to decide if they were also unlawful on other grounds it had noted for investigation, such as whether the options were being made generally available to all customers (as is required by *Sea–Land, see*

*supra* Part III.A.), whether the packages comply with the Commission's policy of promoting resale and shared use of telecommunications service,[11] and whether integrated service packages comply with the *Private Line Rate* guidelines.[12] It instead offered a series of prospective "guidelines" on these issues against which it will judge future integrated service offerings.

■ Petitioners assail the FCC's decision to employ prospective guidelines; they claim that, having designated these issues for investigation and having taken evidence and heard argument on them from both sides, the FCC was obliged to resolve them in this proceeding. An agency does not automatically have to reach every issue whose importance it had noted and on which it had conducted a hearing. *See, e.g., Wisconsin v. FPC*, 303 F.2d 380, 386 (D.C.Cir.1961), *aff'd*, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963). But when it opts not to reach such an issue, the agency must provide an acceptable explanation for its decision—it cannot simply decline to resolve an issue after it holds a hearing. *See Minneapolis Gas v. FPC*, 294 F.2d 212, 215 (D.C.Cir.1961). In this case, the only justification the FCC offered for its decision not to reach many of the issues which it had designated for investigation was that it had held the Tariff 12 options unlawful due to the geographic restrictions. *See Reconsideration Order*, 4 F.C.C.Rcd at 7930; FCC Br. at 52.[13] This justification is inadequate: everyone involved knew, and as the FCC conceded at argument *it* knew, *see* Tr. at 43, that AT & T would shortly thereafter eliminate the geographical restrictions. It is one thing for the FCC to decline to investigate a tariff in the first place; that decision is entrusted to its unreviewable

---

9. Sprint's filing noted, for example, that rates for authorization code calls under options II and IV differed by almost 50 percent. Sprint Petition to Reject or Alternatively Suspend and Investigate at 5, *AT & T Communications, Revisions to Tariff F.C.C. No. 12*, Transmittal No. 1409.

10. It may well be that the FCC would need to review the contracts upon which the tariffs were based in order reliably to determine whether the price differences between the packages are justified.

11. *See, e.g., Resale and Shared Use*, 83 F.C.C.2d 167 (1980), *recon. denied*, 86 F.C.C.2d 820 (1981).

12. *See* 47 C.F.R. Part 61.40; *Private Line Rate Structure and Volume Discount Practices*, 97 F.C.C.2d 923 (1984).

13. We therefore do not consider whether the FCC's issuance of guidelines in the form they were promulgated or in more expansive form would itself be an adequate reason to forgo further decisionmaking.

discretion. It is quite another for it to note the importance of a question concerning a tariff, request and take evidence from the parties, and hold a hearing on the matter, and then "at that point change its mind, wiping out the hearing as though it had never occurred, and in effect decide that it will not enter upon a hearing." *Minneapolis Gas*, 294 F.2d at 215. On remand, then, the FCC must reach the issues it designated for investigation unless it provides an adequate explanation for not doing so.[14]

\* \* \* \* · \* \*

We have the impression that there is a certain air of unreality about this case. The FCC (one way or another) will undoubtedly permit AT & T to compete effectively against its competitors in the large user market (if that is what is really involved here). But we are obliged to insist that it do so by turning square corners of administrative law. We accordingly reverse and remand for proceedings not inconsistent with this opinion.

14. The FCC declined to address IDCMA's contention that integrated offerings violate the policies of the *Computer II* rules on the ground that IDCMA cited no specific rule which the offerings contravene. The Commission thought that IDCMA should instead petition for new rulemaking modifying the *Computer II* rules to address integrated service packages. As integrated offerings do not appear to violate the text of any Commission rule, the FCC acted well within its discretion in deciding to address this issue elsewhere.