### WESTERN UNION CORPORATION, Petitioner,

v.

### FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

### American Telephone & Telegraph Co., et al., Intervenors.

### Nos. 86–1196, 86–1268 and 86–1647.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1988.

Decided Sept. 13, 1988.

---

Milton J. Grossman, with whom H. Richard Juhnke, Arthur H. Simms, and Peter G. Wolfe, Washington, D.C., were on the brief, for petitioner.

John Ingle, Deputy Associate General Counsel, F.C.C., with whom Diane S. Killory, General Counsel, Daniel M. Armstrong, Associate General Counsel, Linda L. Oliver, and Laurel R. Bergold, Counsel, F.C.C., and Robert Nicholson and Andrea Limmer, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondents. Catherine G. O'Sullivan, Atty., U.S. Dept. of Justice, Washington, D.C., also entered an appearance for respondent U.S.

William R. Drexel, Kansas City, Mo. (for Southwestern Bell), with whom Raymond F. Scully, Alan B. Sternstein, Washington, D.C., and John W. Berresford, Philadelphia, Pa. (for Bell intervenors); Jonathan S. Hoak, David W. Carpenter, Washington, D.C., and Francine J. Berry, New York City (for American Tel. & Tel. Co.); Alfred Winchell Whittaker, Richmond, Va. (for Ameritech Operating Companies); R. Frost Branon, Jr., Atlanta, Ga. (for BellSouth Telephone Companies); Saul Fisher, Bedminster, N.J. (for NYNEX Telephone Companies); Dan T. Foley, Oklahoma City, Okl. (for Southwestern Bell Telephone Co.); and Robert B. McKenna, Denver, Colo. (for

U.S. West Telephone Companies) were on the joint brief, for intervenors.

Thomas J. Reiman entered an appearance for intervenors Ameritech Operation Companies, et al. Katherine I. Hall, Washington, D.C., entered an appearance for intervenors the Bell Telephone Co. of Pennsylvania, et al. Martin J. Silverman, Washington, D.C., entered an appearance for intervenor NYNEX Telephone Companies. Robert L. Barada and Stanley J. Moore, San Francisco, Cal., entered appearances for intervenor Pacific Telesis Telephone Companies. T. Michael Payne, St. Louis, Mo., entered an appearance for intervenor Southwestern Bell Telephone Co. Jules M. Perlberg and Dale E. Thomas, Chicago, Ill., entered appearances for intervenor AT & T. Lawrence W. Katz, Prescott, Ariz., James R. Young, Washington, D.C., and J. Manning Lee entered appearances for intervenor Bell Atlantic Telephone Companies.

Dana A. Rasmussen, Washington, D.C., and Robert B. McKenna, Denver, Colo., entered appearances for intervenors Mountain States Tel. & Tel. Co., et al.

Randolph J. May, Timothy J. Cooney, Joseph DeFranco, Howard Monderer, and Daniel A. Huber, Washington, D.C., entered appearances for intervenors American Broadcasting Companies, Inc., et al., in No. 86–1268.

Before MIKVA, EDWARDS, and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Western Union seeks review of the Federal Communications Commission's decisions approving the local telephone exchanges' rates charged to companies providing telex communications. As a ratepayer, Western Union objects that certain costs were improperly allocated to the particular services it required. Because the agency failed to explain adequately its decision approving the allocations of costs proposed by the local telephone exchanges, we

grant the petitions for review and remand to the agency.

## I. BACKGROUND

Following the breakup of American Telephone and Telegraph Company ("AT & T"), the Federal Communications Commission ("FCC" or "Commission") required local telephone exchange companies ("LECs"), as successors to the operating companies that had provided local services as part of the AT & T complex, to provide interexchange carriers (e.g., AT & T, MCI, Sprint, Western Union, and others) with access to local exchange facilities. These services fall into two broad categories: "switched access," which permits interexchange carriers to use local exchange facilities for connecting long-distance telephone calls; and "special access," which permits the exclusive use of LEC facilities to link interexchange carriers with one or more LEC "serving wire centers" ("SWCs") that in turn connect the interexchange carriers with specific customers.

Special access circuits provide a variety of services, among which are telex, telegraph, voice, and video communications. *See generally MCI Telecommunications Corp. v. FCC*, 842 F.2d 1296, 1298 (D.C.Cir.1988) (consolidated for argument with the petitions in this case, but disposed of separately). This case concerns challenges by Western Union to several elements of the tariff schedule approved by the FCC for use of special access facilities.

The tariff schedules submitted by the LECs recognize nine types of special access circuits or channels. Beginning with the simplest systems and moving up the scale to the most complex, these consist of metallic, telegraph-grade, voice-grade, program audio, video, wideband analog, wideband data, digital data, and high capacity systems. Western Union is primarily concerned with the rates charged for its use of metallic and voice-grade channels.

The rates charged for each of the special access channels are comprised of three components that, added together in various configurations, determine the full amount charged for a particular service. *Channel termination*, also called *"loop,"* is the most basic component and provides the connection between an interexchange carrier and a local SWC, as well as between the SWC and the customer's premises. All carriers pay a flat rate for the use of the basic loop. Some carriers have additional loop costs depending on the quality of access the carrier needs in order to serve its customers. The second component is *channel mileage* or *"trunk,"* which covers the cost of service between two SWCs. Western Union does not use trunk facilities. The third component, "optional features and functions," is not at issue here.

The LECs offer users a choice of special access services in order to provide the users flexibility in determining the quality of service they require. In principle, the tariffs charged by the LECs for these services should reflect the costs that are fairly allocable to the facilities utilized by their interexchange customers. Many elements of the LECs' costs, however, cannot be assigned directly to any one specific service. In an effort to allocate the costs fairly among the different types of service, the FCC has adopted guidelines that it has set out in a Separations Manual. The Separations Manual, 47 C.F.R. Pt. 67 (1987), begins by establishing principles for allocating costs between interstate service (subject to FCC regulation) and intrastate service (subject to state regulation). After this initial division, the interstate service is further divided into various categories, including special access. The Separations Manual does not subdivide costs among the nine types of channels or the three components.

As providers of the regulated services, the LECs submitted tariff proposals that the FCC approved subject to some modifications. The allocation decisions at issue in this case required further investigation, and eventually the FCC issued its final determination. *Investigation of Special Access Tariffs of Local Exchange Carriers*, FCC 86–52 (released Jan. 24, 1986) (*"Special Access Order"*), Joint Appendix ("J.A.") at 771. Western Union petitioned the FCC for partial reconsideration, which

the FCC denied. *Order Denying Reconsideration,* 1 FCC Rcd. 427 (1986).

In petitioning for review, Western Union's challenges can be grouped into three principal categories. First, it complains that the LECs have included, in their computation of the rate to be charged for voice-grade loop service, categories of investment that are properly attributable to the provision of trunk rather than to loop-related services. Second, Western Union asserts that the rate base for the metallic channel used for its telex services contains cost elements properly attributable to higher grades of service. The third challenge concerns the alleged inequity of charging users of 2–wire metallic circuits a higher rate than that charged users of other kinds of 2–wire circuits. Western Union claims in each instance that the FCC acted in an arbitrary and capricious manner in failing to give adequate consideration to the evidence introduced by Western Union in support of its positions and in the Commission's failure to provide reasoned explanations for its conclusions.

## II. Discussion

### A. Standard of Review

We apply the traditional standard of review for ratemaking cases: The agency's decisions will only be overturned if found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1982). "[T]he FCC must demonstrate a 'rational connection between the facts found and the choice made.'" *City of Brookings Mun. Tel. Co. v. FCC,* 822 F.2d 1153, 1165 (D.C. Cir.1987) (quoting *Farmers Union Cent. Exch., Inc. v. FERC,* 734 F.2d 1486, 1499 (D.C.Cir.), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984)). As we have repeatedly stressed, this connection must appear in the agency decision and the record; *post hoc* rationalizations by agency counsel will not suffice. *City of Brookings,* 822 F.2d at 1165. The agency must consider responsible alternatives; if they are rejected, it must explain why. *Id.* at 1169.

### B. Western Union's Challenges

#### 1. *Misallocation of Costs In Determination of Loop Rates*

The FCC permitted the LECs to include two items of cost in setting loop rates: Voice Grade Performance ("VGP") and Facilities Interface ("FACIF"). Western Union claims that these costs should be charged to trunk users but not to loop users. Western Union argues that the VGP and FACIF categories, created for this ratemaking, contain costs for equipment included in an earlier LEC category, *"other special,"* that related only to trunk facilities. As the LECs' own books had allocated these costs to trunk equipment, Western Union maintains that only those interexchange carriers that need trunk service should absorb the costs.

In the proceedings before the FCC, the LECs explained that the VGP and FACIF categories contained equipment (e.g., "pads and repeaters") that is used to provide both trunk and loop service. As the "other special" category had been developed under a different accounting methodology that did not distinguish between trunk and loop costs, the costs were automatically assigned to trunk services. Western Union points out, however, that the LECs acknowledge that pads and repeaters are necessary for *both* trunk and loop services. Therefore, the record does not support the allocation of *all* the costs of VGP and FACIF to loop users. Furthermore, Western Union asserts there was evidence before the FCC that the charge for basic loop service already included an allocation of costs for all the pads and repeaters actually needed to provide basic loop service.

The FCC initially appeared to accept the argument that VGP costs should be reallocated, *Investigation of Access and Divestiture Related Tariffs,* FCC 85–100 (released Mar. 8, 1985), J.A. at 246, 257, and listed this among the issues reserved for further examination. *Order Designating Issues for Investigation,* 50 Fed.Reg. 23,189, 23,-191 (May 31, 1985). In the *Special Access Order,* however, the FCC adopted the LECs' original position and rejected West-

ern Union's petition for reconsideration of this issue.

In its rejection, the FCC failed to recognize that the pertinent question presented by Western Union was not *whether* pads and repeaters are used in providing loop service (everyone agrees that they are); but rather, *how much* of the cost for pads and repeaters in the LECs' VGP and FACIF categories was properly chargeable to loop service. As a consequence, the FCC never addressed the issue.

### 2. *Misallocation of Three Types of Plant Investment to Metallic Service*

Western Union's second objection focuses on the allocation of "central office equipment" ("COE") costs, station apparatus costs, and certain private branch exchange ("PBX") costs. COE is used for various purposes relating to the transmission of signals over special access channels. In the initial tariff filing, COE costs had been allocated to loop service and charged against all types of channels, including metallic. Western Union claims that none of the COE is needed for basic metallic service.

Station apparatus and PBX equipment is owned by the LECs but located on the premises of customers. Western Union made two arguments regarding these items. First, as station apparatus and PBX are located on the premises of customers that need it, it is "user specific," and their costs should not be included in the general rate base. Second, even if the agency rejected a "user specific" approach, these costs should not be allocated to metallic circuits. In its petition, Western Union asserts that the FCC failed to address some of its arguments about these three categories of equipment.

The FCC acknowledges that its *Special Access Order* did not address the issue of COE costs. Brief for Respondent at 22. In seeking reconsideration, Western Union repeated its concerns about the allocation of COE costs. The *Order Denying Reconsideration,* however, simply assumed that the *Special Access Order* had adequately

considered the issue and failed once again to address it. *Order Denying Reconsideration,* 1 FCC Rcd. at 428 ¶ 15. *See* Brief for Respondent at 23 & n. 66.

Western Union also asserts that although the *Special Access Order* rejected Western Union's "user specific" argument, it did not discuss Western Union's contention that as metallic loop users received no benefits from the station apparatus and PBX equipment, they should not be required to contribute to the recovery of its costs. On reconsideration, the FCC acknowledged the latter position, *Order Denying Reconsideration,* 1 FCC Rcd. at 428 ¶ 15, but inexplicably added language that implied the metallic rate base question had also been resolved in the *Special Access Order.* The *Special Access Order,* J.A. at 805 ¶ 63, however, only discussed why station apparatus and PBX costs could be charged to basic *voice* channels.

It is possible that the FCC's rationale for rejecting Western Union's user specific arguments also applies to Western Union's argument that metallic users should not pay for these costs. The *Order Denying Reconsideration,* however, makes no attempt to provide an explanation for rejecting Western Union's argument. Instead, it baldly asserts that the issue has been decided. This hardly constitutes reasoned decisionmaking.

### 3. *Disproportionate Rates Charged Users of 2–Wire Metallic Circuits*

Certain users of special access services may choose between 2–wire and 4–wire circuits. The 2–wire circuits can accommodate metallic, telegraph, and voice-grade services. The 4–wire circuits, which provide a higher grade of transmission, are available for telegraph and voice-grade systems but not metallic. As the description of the circuits suggests, the latter require twice the investment in wiring as the former. Approximately ninety percent of Western Union's needs are met through the use of 2–wire metallic service loops.

Although the ratio of basic material costs between the 4–wire and 2–wire circuits suggests, as a starting point, a rate

differential of 2 to 1, the tariffs initially submitted by the LECs established a ratio in basic loop rates between the two of approximately 1.25 to 1. The rates for 2–wire circuits were identical, irrespective of whether they provided metallic, telegraph, or voice-grade services. The same was true for 4–wire circuits. *See, e.g.,* Brief for Petitioner at 10 (chart showing, in the December 1984 rate proposal, a rate of $16.13 for the 2–wire circuits, one of $23.28 for the 4–wire circuits).

The FCC's *Special Access Order* mandated an overall change in the relationship between 4–wire and 2–wire rates to a ratio of 1.6 to 1. J.A. at 822 ¶ 106. In responding to that order, the LECs raised the 4–wire rates and lowered the 2–wire rates for telegraph and voice-grade services but left the metallic service rate unchanged. This disturbed the parity that had previously existed among the 2–wire services. Western Union asked the FCC to restore parity by directing a comparable reduction in the post-adjustment tariff posted for 2–wire metallic circuits. The FCC refused. *Order Denying Reconsideration,* 1 FCC Rcd. at 428 ¶ 16.

Western Union argues that the FCC's decision requiring a change in the ratio between the 4–wire and 2–wire rates rested on factors that affect the allocation of costs in the basic service level, whether performed by metallic or other 2–wire circuits. Specifically, the material in a metallic loop is indistinguishable from that in other basic 2–wire loops. Thus, it would seem, it should command the same rate as other 2–wire circuits, as it did in the rates originally proposed by the LECs. Nevertheless, the *Order Denying Reconsideration,* 1 FCC Rcd. at 428 ¶ 16, does not explain why the Commission rejected this rationale.

### III. Conclusion

The FCC has failed to provide an adequately reasoned explanation for the decisions challenged in this case. We therefore grant Western Union's petitions for review, and remand to the Commission for its further consideration.

*So ordered.*