United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

No. 97-3446

_____

| | | |
|---|---|---|
| Southwestern Bell Telephone Company, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| Bell Atlantic Telephone Companies, | * | Petition for Review of An Order |
| | * | of the Federal Communications |
| Intervenor on Petition, | * | Commission. |
| | * | |
| v. | * | |
| | * | |
| Federal Communications Commission | * | |
| and United States of America, | * | |
| | * | |
| Respondents, | * | |
| | * | |
| New Valley Corporation, | * | |
| f/k/a Western Union, | * | |
| | * | |
| Intervenor on Petition. | * | |

_____

Submitted: January 16, 1998

Filed: March 11, 1998

_____

Before RICHARD S. ARNOLD, Chief Judge, MORRIS SHEPPARD ARNOLD, Circuit Judge, and SACHS,[1] District Judge.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

## I.

In the early 1980s, following the breakup of AT&T, the Federal Communications Commission required local telephone companies, or local exchange carriers ("LECs"), to provide long-distance companies, also called interexchange carriers ("IXCs"), with access to local exchange facilities at a regulated and approved rate. Interexchange service generally originates with LEC facilities through which the sending party is connected to the IXC, and then terminates with LEC facilities. An IXC cannot provide service without access to local facilities.

The LECs provided two types of service to meet the obligation that the FCC imposed on them. First, they offered switched access services in which the IXCs used the LECs' regular local service facilities for originating and terminating long-distance telephone calls; second, they offered special access services in which an IXC would have the exclusive use of certain dedicated LEC facilities linking the IXC with its customers through the intermediary of LEC serving wire centers ("SWCs"). In return, the IXCs would have to pay the LECs a reasonable fee, as determined by the FCC. Only the special access charges are relevant to this case.

During the period that these special access rates were in effect, special access circuits were used primarily to transmit telex, telegraph, video, voice, digital, and other

---

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, sitting by designation.

signals between end users and IXCs. At issue in this appeal are cost allocations relating to only two of the nine generally available circuit or channel types, namely, metallic and voice-grade channels. Metallic service was the lowest grade of service offered, and a voice-grade circuit was, as its name suggests, a circuit capable of carrying data in the frequency range of voices.

The rates charged for special access channels comprised three components. The basic component was the charge for utilizing a "loop." The loop is the connection between the end user's premises and a nearby SWC, as well as between an IXC's local connection point and the appropriate SWC. All IXCs use some amount of loop service in connecting interstate lines with end users. The second component of the rate was the charge for utilizing a "trunk." The trunk is the connection between two SWCs, necessary to facilitate connections between end users and IXCs associated by proximity with different SWCs. (Thus a typical long-distance transmission would begin with an end user connected by a LEC loop to a nearby SWC. The SWC would, if necessary, be connected to another SWC via the LEC's trunk equipment, and another loop would connect the SWC to the IXC's line. At the receiving end the same sequence would be duplicated in reverse.) The third component of the rates, denominated "optional features and functions," is not relevant to this case.

In the early 1980s, the FCC permitted LECs to charge only a "reasonable rate" for this mandatory service, that is, a rate that enabled the LECs to recover the cost of providing the service plus something called a "reasonable rate of return." Because the LECs used the same facilities to provide different types of service to different customers, the rate-setting process necessarily involved the allocation of shared costs among disparate users. This case arose from a dispute over the method by which the LECs allocated the costs in their tariffs.

In 1983, the FCC decided that the system of exchange access compensation then in effect was unlawfully discriminatory. *See* 47 U.S.C. § 202(a). The FCC thus

decided to replace that system with a more uniform rate structure. Over the course of the next year and a half, in order to comply with new FCC guidelines, the LECs proposed various revised special access tariffs. All of them were suspended and eventually found unlawful by the FCC. In March, 1985, in accordance with a few specified adjustments from their previous proposal, the LECs filed tariffs that were accepted subject to investigation. Although the FCC never suspended these tariffs, it did instruct the LECs to keep accurate accounts of the charges in order to facilitate accurate refunds if they should prove necessary. These rates remained in effect for about six months.

Early in 1986, the FCC issued a final order concluding its investigation and upholding these special access tariffs. In determining that the cost allocations in the tariffs were reasonable, the FCC rejected arguments in particular from Western Union, an IXC, that several specific costs allocated to the loop component of the rates should be allocated exclusively to the trunk component. It later rejected Western Union's argument that metallic service rates should be lowered to preserve their previous relationship with low-quality voice-grade service, the rate of which was lowered as a result of the FCC's order.

Western Union petitioned the D.C. Circuit for review of the FCC's order. In 1988 that court determined that the FCC had failed adequately to explain its rejection of Western Union's arguments and remanded the case to the FCC for reconsideration of three specific issues. *See Western Union Corp. v. FCC*, 856 F.2d 315, 316-17, 320 (D.C. Cir. 1988). Almost immediately thereafter the FCC's Common Carrier Bureau invited interested parties to comment on how it should resolve the issues remanded to it. It did not resolve those issues until nearly nine years later. In its order the FCC reversed itself on two of the three matters remanded, on the ground that the LECs had failed adequately to justify the cost allocations at issue.

Southwestern Bell, an LEC, then filed a timely petition for review with this court. We affirm.

## II.

Both Southwestern Bell and the FCC raise threshold issues only tenuously related to the merits of the case: Southwestern Bell argues that certain procedural infirmities abrogated the FCC's authority to order these refunds, and the FCC posits a procedural bar to this court's authority to consider Southwestern Bell's petition. We find none of these arguments persuasive.

Southwestern Bell maintains that the FCC had no authority to order Southwestern Bell to refund money to Western Union because the FCC violated two procedural provisions of 47 U.S.C. § 204(a). The two provisions in question are the statute's time limitations and its supposed requirement that before tariffs can be retroactively altered they must first be suspended.

Section 204(a)(1) permits the FCC to suspend a proposed charge or tariff for a period of up to five months beyond the time that it would otherwise go into effect, during which period the FCC may conduct an investigation to assess the legality of the proposed rates. If the FCC does not rule on the legality of the proposed tariffs within the allotted time, those tariffs automatically go into effect until it does so. Section 204(a)(2)(A) limits the time period to five months for the issuance of such a ruling (before the 1996 amendments, the period was 12 or 15 months, depending on the complexity of the issues involved).

In this case, the FCC made the rates in question effective on April 1, 1985. Then, in orders in January and November, 1986, it concluded that the tariffs were legal and ended its investigation. After the D.C. Circuit remanded the matter to the FCC for reconsideration, the FCC, as we have said, failed to act on the case for nine years, neither ordering refunds nor confirming its earlier position. When the FCC did finally

issue its order, more than 12 years had passed between the effective date of the tariffs and the FCC's refund order. Southwestern Bell argues that the FCC is barred from ordering these refunds now because of its excessively slow proceeding. We disagree because we believe that the time constraint imposed by § 204(a)(2)(A) does not operate as a statute of limitations and that its violation therefore does not end the FCC's authority to act.

We have held that "[a]bsent specific statutory direction, an agency's failure to meet a mandatory time limit does not void subsequent agency action." *Newton County Wildlife Ass'n v. U.S. Forest Service*, 113 F.3d 110, 112 (8th Cir. 1997), *cert. denied*, 66 U.S.L.W. 3355 (1998). *See also Brotherhood of Railway Carmen Division v. Pena*, 64 F.3d 702, 704-05 (D.C. Cir. 1995). Section 204(a)(2)(A) contains no provision touching on the appropriate remedy, if any, for the FCC's failure to adhere to the time limit that it imposes. Thus the section does not operate as a statute of limitations, and the FCC does not lose its authority to act for having violated it.

Southwestern Bell also contends that in failing to suspend the proposed rates the FCC failed to comply with a statutory requirement that it do so, and so lost its authority to act. But we believe that § 204(a)(1) does not require the FCC to suspend the proposed rates before it investigates them -- it only allows the FCC to do so. The statute states that, either on its own initiative or upon complaint, and pending a hearing concerning the lawfulness of a proposed charge, the FCC "may suspend the operation of such charge ... in whole or in part but not for a period longer than five months beyond the time when it would otherwise go into effect."

We believe that the primary purpose of the suspension is to mitigate the transaction costs that might be incurred if the FCC eventually rejects the tariff: If the investigation can be completed in five months, and the rates are found to be illegal, no refunds are necessary if the tariffs were suspended, because the illegal rates were never imposed. But in any case the language of § 204(a)(1) is permissive, not mandatory:

it does not require the FCC to suspend proposed tariffs; it only gives it the authority to do so. *But see Illinois Bell Tel. Co. v. FCC,* 966 F.2d 1478, 1481-82 (D.C. Cir. 1992).

The fact that the FCC customarily suspends proposed rates does not mean that its failure to do so in any particular instance invalidates its subsequent action. Furthermore, a possible secondary purpose of the suspension, that is, to put the company with the proposed rates on notice of possible defects in the tariff, is served by another provision in the section, namely, that the FCC may require the proposing companies to keep an accounting during the period of investigation in order to facilitate a refund should one be necessary. That is precisely what the FCC did in this case.

### III.

The FCC also raises a procedural objection to our immediate adjudication of this case. Its argument is that 47 U.S.C. § 405(a) requires Southwestern Bell to exhaust all administrative remedies prior to raising an issue before the court. That statute forbids judicial review of a dispute where the party seeking review "relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass." *Id.* Southwestern Bell's procedural issues relating to the interpretation of § 204(a) present questions of law not yet passed on by the FCC. Thus, the FCC argues, Southwestern Bell must present these issues to the FCC itself in an application for review before raising them in this court.

But exhaustion is not required when unreasonable administrative delay would render the administrative remedy inadequate. *See Gibson v. Berryhill*, 411 U.S. 564, 575, n.14 (1973) (noting that administrative remedies are deemed inadequate "[m]ost often ... because of delay by the agency"), and *Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 591-92 (1926) (petitioner "is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court for equitable relief"). In this case, the FCC failed for nine years to adjudicate the issue before it on remand from the

D.C. Circuit, in part, no doubt, because the tariffs at issue in this appeal were in effect for only six months before they were replaced and are thus no longer relevant. The resolution of the issues that this case raises will therefore have little or no future effect.

But precisely because the issues are stale and irrelevant from the FCC's point of view, we believe that if we were to defer first to the FCC to resolve them, further delay would be not only possible but inevitable. As the FCC's attorney noted at oral argument, "There is a lot going on at the Commission -- this case is almost a relic." The FCC's record of delay in this matter may not, as we have said, invalidate its action, but it does render an administrative remedy manifestly inadequate.

## IV.

When the D.C. Circuit remanded matters relevant to this case to the FCC, it singled out three issues for further consideration: The misallocation of costs in the determination of loop rates, the misallocation of plant investment to the rates for metallic service, and the disproportionate rates charged to users of two-wire metallic service. *See Western Union Corp.*, 836 F.2d at 318-19. The court did not determine that these allocations are unreasonable, merely that the FCC acted arbitrarily in confirming them. *Id.* at 320. Upon review, the FCC reversed itself on the first two issues and stood by its decision on the third. Southwestern Bell argues that in reversing its earlier decisions on these two issues, the FCC acted arbitrarily and capriciously.

## A.

Southwestern Bell bases this argument, in part, on an incorrect interpretation of the FCC's order on remand. It contends correctly that the FCC merely requested comments from interested parties on whether the record as it existed was adequate for the FCC to determine how the costs should be allocated. But Southwestern Bell goes on to maintain that because the FCC asked only whether supplemental information might be necessary and did not actually request any supplemental information, its final

-8-

determination that the LECs did not adequately justify their cost allocations was arbitrary because this conclusion did not follow logically from the requests in its order. That is, Southwestern Bell argues that the determination that the record was not sufficient to justify the cost allocations should have been made only after the LECs were asked to submit any necessary supplemental information, and that they did not do so because the order on remand did not request it. The only proper determination that the FCC could have made, Southwestern Bell argues, short of deciding that the record was sufficient and that the costs were justified, was a determination on how the record should be supplemented.

But this conclusion misses the point. The FCC was under no obligation to inform the LECs how they might best supplement the record, or even to request that the record be supplemented. The question on remand was whether the FCC was correct in determining that the LECs properly justified their cost allocations in 1985, and the FCC asked for comments relating to its ability to make this determination. But it did not seek new justifications. It then determined that, in fact, the LECs did not meet their burden of proof in justifying the relevant cost allocations. Southwestern Bell is off the mark in arguing that it should have been told how it might supplement the record in order to justify its allocations. Furthermore, the FCC notes in its refund order that if the LECs can offer supplemental evidence to suggest that the refunds should be reduced, they may do so. It is in this context that the LECs may attempt anew to justify some or all of their 1985 allocations. But on the question addressed by the D.C. Circuit's remand and the FCC's order, namely, whether the allocations were properly justified at the time that they were made, supplemental evidence was irrelevant. It is worth pointing out, too, that all of the LECs that responded to the FCC's request for comments argued that the record as it existed provided more than adequate support for their cost allocations.

Southwestern Bell also argues that the FCC simply did not provide any basis for its opinion on remand that the LECs did not in fact adequately justify their original cost allocations. It is to this question that we now turn.

**B.**

The first contested aspect of the LECs' special access rate structure is the allocation of some of the costs associated with voice-grade performance investment (VGP) and facilities interface equipment (FACIF) to the loop component of the rate. The LECs contend that both of these are charges for equipment used to provide circuit continuity between a customer's premises and its SWC. But it is not clear if, in fact, the equipment is more properly associated with loop service or with trunk service.

Prior to the 1985 tariff-system shift, VGP charges were placed in a category called "other special" along with investment costs in other sorts of equipment not otherwise specifically categorized in the old system. The IXCs contend that this old category contained charges properly attributable only to the trunk portion of a circuit. FACIF charges were, in the pre-1985 system, allocated on a facility- and user-specific basis. In the 1985 rate scheme, however, VGP charges were allocated to the loop component, and FACIF charges were aggregated (i.e., no longer facility- and user-specific) and allocated to the loop component of each service with which they were associated (thus there was a separate FACIF charge in the loop component for metallic service, for video service, etc.).

The LECs assert, of course, that these allocations were reasonable and justified. But because certain IXCs (most notably for this appeal, Western Union) used no trunk service (or very little trunk service), those IXCs objected to portions of the new allocation system that saddled them with VGP and FACIF costs arguably associated only with providing trunk service, and which were only newly allocated to the loop component in the tariffs.

-10-

Upon consideration of this argument, the FCC originally concluded that it was indeed proper to allocate some VGP and FACIF costs to the loop rate element. In reviewing this conclusion, however, the D.C. Circuit found that in approving the tariffs, the FCC had failed to address the pertinent question raised by Western Union, which, the court held, was not whether it was proper to allocate some of the VGP and FACIF costs to the loop element, but rather how much of those costs was properly chargeable to it.

In response to the order from the FCC inviting comments on this matter, the LECs presented several justifications for the apparent shift in cost allocations. Several LECs argued that the category that formerly included VGP and FACIF tariffs, the "other special" category, was only a means for grouping costs and was not limited to trunk equipment. Some argued that VGP and FACIF costs were in fact incurred in the provision of both loops and trunks. And one LEC argued that the category in which these charges were placed was not based on the function of the equipment at all, and so that costs assigned to trunk categories were not necessarily even trunk costs.

Other LECs argued that they had allocated costs in the "other special" category to loop and trunk rate elements on the basis of unit-cost studies, and that it was impossible to disaggregate VGP and FACIF costs from other costs in the category. (Unit-cost studies identify the cost to a LEC of providing one unit of a particular service and recommend rates based on recovering that cost plus a reasonable portion of overhead. Thus, costs determined by a unit-cost study will be determined by reference to the aggregated costs for all of the equipment required to provide a service.)

But the FCC determined that the LECs did not offer sufficient engineering data to demonstrate the extent to which they used VGP and FACIF equipment to provide loop services. Furthermore, the FCC faulted the LECs for failing to explain how they actually conducted their unit-cost studies and, notably, for failing to submit those studies. These determinations find support in the record.

The FCC then concluded that the specific allocations were unjustified because in a § 204(a) investigation the carrier bears the burden of proving the reasonableness of its charges. *See* 47 U.S.C. § 204(a)(1) ("the burden of proof to show that the new or revised charge, or proposed charge, is just and reasonable shall be upon the carrier"). The FCC found that although the LECs did show that they used some amount of VGP and FACIF equipment in providing loop service, their arguments did not provide a reasonable basis for determining how much; the FCC further found that the LECs did not carry the burden of demonstrating that the allocation that they used was in fact reasonable. The FCC did not adopt Western Union's proposal that none of these costs should be allocated to loop charges; it concluded only that the LECs did not properly justify the costs as loop charges.

As the D.C. Circuit noted in its 1988 opinion, an agency's decision will be overturned only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Western Union Corp.*, 856 F.2d at 318. *See also* 5 U.S.C. § 706(2)(A). We discern none of these defects in the FCC's order. Southwestern Bell mischaracterizes the order as holding that none of these VGP and FACIF costs should have been allocated to the loop component of the tariff. But the order actually states only that Southwestern Bell failed to meet its burden of proving how much of these costs were properly allocated to that component. The order goes on to require Southwestern Bell to refund the charges to Western Union because the LECs did not justify their allocation to the loop element. It is of course open to the LECs to supply that justification and to argue that full refunds are not in order. But until they provide such a justification, there is nothing arbitrary about the FCC's order. It merely applies the strict standard that Congress imposed in § 204(a)(1).

## C.

The second contested substantive issue in this case is the LECs' allocation of some of the costs associated with supplying station apparatus and large private branch exchange (PBX) equipment (both located on customer premises) to Western Union's

two-wire metallic and voice-grade services, and the LECs' allegedly excessive allocation of central office equipment (COE) costs to providing Western Union's metallic service. Western Union argues that, although station apparatus and PBX equipment were not used at all to supply it with two-wire metallic and voice-grade channel termination services, and although COE only very marginally contributed to the provision of metallic service, Western Union was nevertheless charged for these apparatuses. At the time that this allocation system was proposed, the FCC accepted the notion that rates for a particular service, provided to a specific customer, should be based on the pro-rated cost of providing that service to all of an LEC's customers, not just on the cost of the specific equipment required to provide the service to that particular customer. In fact, the FCC had previously rejected as needlessly expensive a proposal for an allocation mechanism that distributed costs associated with voice-grade service on the basis of individual use.

In reviewing these arguments, the D.C. Circuit found, first, that the FCC had failed to address Western Union's allegation that the LECs allocated a disproportionate part of COE costs to providing metallic service. *See Western Union Corp.*, 856 F.2d at 319. Second, the court found that, although the FCC explained why it had rejected the user-specific allocation system with respect to the provision of voice-grade service, it did not address Western Union's argument that such a system saddled customers of metallic service with costs for which they received no benefits. *Id.*

Upon reconsideration, the FCC concluded that the LECs did not meet their burden of justifying the amount of PBX and station apparatus allocated to metallic service rates. The FCC concluded that the record was at least inconclusive regarding whether the LECs ever employed more than a de minimis amount of this equipment in providing metallic service, and the LECs, in response, provided only general statements indicating that they did in fact use this equipment to provide metallic service. In earlier statements, however, and in connection with other complaint proceedings, the LECs had indicated that they employed little or no "circuit equipment" in providing metallic

service. Furthermore, the FCC pointed out that even if the LECs did use large amounts of COE to provide metallic service, they had submitted no records from which it would have been possible to determine whether the specific rate charged was reasonable.

The FCC concedes that it might very well have been reasonable, at times, to provide metallic service over existing voice lines, thereby occasionally utilizing these facilities. But the LECs have not indicated how often this was done, nor have they indicated the portion of voice-grade COE costs actually attributable to providing metallic service. Because the LECs bear the burden of justifying their rates, the FCC concluded, they are liable for refunds to Western Union for some portion of these unsupported cost allocations. We believe that nothing in this conclusion or its reasoning even approaches the arbitrary and capricious. The FCC was again merely following the relevant provisions of § 204(a)(1).

Southwestern Bell makes much of the fact that the FCC's order represents a reversal of its earlier holding that found these allocations reasonable. In fact, Southwestern Bell argues that "such an about-face is arbitrary and capricious decisionmaking." But the mere change of an administrative opinion after a lawful reconsideration can hardly be arbitrary and capricious on its face. In this case, the D.C. Circuit ruled that the FCC's prior order accepting the LECs' cost allocations was arbitrary and capricious. *See Western Union Corp.*, 856 F.2d at 320. The court, as we have been at pains to say, made no ruling on the actual reasonableness of the allocations, but ruled only that the FCC accepted those allocations without proper justification. *Id.* Neither the D.C. Circuit nor the FCC has declared that the cost allocations are unreasonable, but both have declared them to be unjustified. This order by the FCC, far from being arbitrary and capricious, incorporates a degree of court-imposed reflection and, we believe, corrects previous arbitrary and capricious behavior.

## V.

For the reasons indicated, we affirm the order of the FCC.

A true copy.

Attest:

           CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.